## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| CHEVRON TCI, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 18-776 |
| | ) |
| CAPITOL HOUSE HOTEL MANAGER, LLC, | ) |
| and THE WILBUR MARVIN FOUNDATION, | ) |
| | ) |
| Defendants. | ) |

*****************************************************************************

## **COMPLAINT**

Plaintiff Chevron TCI, Inc. ("Chevron" or "Plaintiff") for its Complaint against Defendants, Capitol House Hotel Manager, LLC ("Capitol House") and The Wilbur Marvin Foundation (the "Foundation") (together, the "Defendants"), alleges as follows:

1.

Chevron is a corporation that is incorporated under the laws of the State of California with a principal place of business in San Francisco, California.

2.

Capitol House is a limited liability company under the laws of the State of Louisiana, which upon information and belief, has one sole member, Capitol House Hotel Operating Company, LLC, a Louisiana limited liability company, whose sole member is The Foundation.

3.

The Foundation is a non-profit corporation created and organized under the laws of the State of Louisiana, with a principal place of business in Baton Rouge, Louisiana.

4.

As further explained below, this is an action to enforce the Defendants' contractual obligations to pay Chevron over $10 million pursuant to a purchase agreement and guaranty agreement.

**JURISDICTION AND VENUE**

5.

Jurisdiction is proper under 28 U.S.C. §§ 1332(a) and (c) because there is complete diversity of citizenship between the Plaintiff and the Defendants and the amount in controversy exceeds $75,000.

6.

Venue is proper in this district under 28 U.S.C. § 1391(b) because the Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

7.

In 2005, Chevron invested in Capitol House Hotel Operating Company, LLC (the "Company"), which was formed to lease, hold, maintain, and operate a hotel and commercial space in downtown Baton Rouge, now known as the Hilton Capitol Center.

8.

When Chevron invested in the Company, it entered into a Purchase Agreement with Defendant Capitol House, dated December 29, 2005, pursuant to which Chevron was granted an option, for a six-month period beginning January 1, 2012, (the "Put Option Period"), to elect to sell its membership interest in the Company to Capitol House (the "Put"). Capitol House was obligated:

> Within thirty (30) days after delivery to [Capitol House] of an Election Notice from [Chevron], [Capitol House] shall pay to [Chevron] a purchase price (the "Put Price") in immediately available funds (with interest thereon at the Designated Prime Rate commencing on the 30th day following the date of such delivery) in the amount of twenty percent (20%) of [Chevron's] Capital Contribution to the Company plus the amount of any unpaid Asset Management Fees, Special Tax Distributions, and Priority Return and interest thereon owed to [Chevron] through the date of payment of the Put Price, and amounts, if any, due to [Chevron] from [Capitol House], Landlord or Affiliates under the Operating Agreement or the Project Documents or any Guarantor under the Guaranty Agreement.

A true and accurate copy of the Purchase Agreement is attached hereto as Exhibit A.

9.

On or about December 29, 2005, Chevron also entered into a Guaranty Agreement with the Foundation (the "Guaranty"), under which the Foundation unconditionally and irrevocably guaranteed all obligations of Capitol House under the Purchase Agreement, which obligations

3

include, among other things, the payment of the Put Price to Chevron. A true and accurate copy of the Guaranty is attached hereto as Exhibit B.

10.

On or about May 31, 2007, Chevron and Capitol House entered into an Amended and Restated Purchase Agreement to correct certain typographical errors in the original Purchase Agreement. The Amended and Restated Purchase Agreement also restated the parties' rights and obligations under the Put Option and established a new Put Option Period. A true and accurate copy of the Amended and Restated Purchase Agreement is attached hereto as Exhibit C.

11.

Thereafter, the parties entered into seven amendments to the Amended and Restated Purchase Agreement, each of which defined a new Put Option Period, with the seventh and final amendment stating: "The Put may be exercised by [Chevron] at any time prior to December 31, 2015." True and accurate copies of the seven amendments to the Amended and Restated Purchase Agreement are attached hereto as Exhibit D.

12.

Contemporaneous with each of the seven amendments to the Amended and Restated Purchase Agreement, the Foundation executed a Guarantor Acknowledgement, acknowledging that the Guaranty remains in full force and effect and that the obligations of the Foundation thereunder have not been modified, except to the extent the amendments amended the Purchase

Agreement. The Guarantor Acknowledgements can be found on page 4 of each of the seven amendments to the Amended and Restated Purchase Agreement.

13.

On November 19, 2015, Chevron exercised its Put and sent Capitol House an Election Notice, which demanded the purchase of Chevron's interest in the Company by Capitol House for the Put Price of $10,554,519. A true and accurate copy of the Election Notice is attached hereto as Exhibit E.

14.

Capitol House did not respond to the Election Notice, but counsel for the Foundation responded on or about December 30, 2015, declining to pay the Put Price.

15.

On November 3, 2016, counsel for Chevron sent a letter to Capitol House and the Foundation demanding payment by December 30, 2016 of the Put Price in the amount of $10,958,475, which was comprised of: (i) a base purchase price of $2,347,139 (i.e., twenty percent of Capital Contributions of $11,735,693) plus interest in the amount of $53,116; (ii) unpaid Priority Return and Asset Management Fees, plus interest thereon, in the aggregate amount of $3,758,227; (iii) 2016 prorated (through August 11, 2016) Priority Return and Asset Management Fee of $221,211; (iv) 2012 Special Tax Distribution of $3,317,517; and (v) interest on 2012 Special Tax Distribution of $1,261,266. A true and accurate copy of the November 3, 2016 letter is attached hereto as Exhibit F.

16.

Neither Capitol House nor the Foundation formally and directly responded to the November 3, 2016 letter.

17.

Capitol House failed to pay Chevron the Put Price within thirty (30) days of delivery of the Election Notice, as required under the Amended and Restated Purchase Agreement.

18.

The Foundation also failed to pay Chevron the Put Price, as required under the Guaranty.

19.

To date, neither Capitol House nor the Foundation has paid the Put Price.

20.

As of the filing of this lawsuit, the Put Price is $10,915,145 which amount is comprised of: (i) a base purchase price of $2,347,139 (i.e., twenty percent of Capital Contributions of $11,735,693) plus interest in the amount of $251,160; (ii) unpaid and prorated Asset Management Fees, plus interest thereon, in the aggregate amount of $91,107; (iii) unpaid and prorated Priority Return, plus interest thereon, in the aggregate amount of $6,285,351; (iv) 2012 Special Tax Distribution of $1,638,235; and (v) interest on 2012 Special Tax Distribution of $302,153.

## COUNT I
## BREACH OF CONTRACT
### (Against Capitol House)

21.

Plaintiff repeats and realleges the allegations of paragraphs 1 through 20 as though fully set forth herein.

22.

The Purchase Agreement, Amended and Restated Purchase Agreement, and the First through Seventh Amendments to the Amended and Restated Purchase Agreement are valid and binding contracts, and are referred to collectively as the "Purchase Agreement."

23.

Under the Purchase Agreement, Capitol House was obligated:

Within thirty (30) days after delivery to [Capitol House] of an Election Notice from [Chevron], [Capitol House] shall pay to [Chevron] a purchase price (the "Put Price") in immediately available funds (with interest thereon at the Designated Prime Rate commencing on the 30th day following the date of such delivery) in the amount of twenty percent (20%) of [Chevron's] Capital Contribution to the Company plus the amount of any unpaid Asset Management Fees, Special Tax Distributions, and Priority Return and interest thereon owed to [Chevron] through the date of payment of the Put Price, and amounts, if any, due to [Chevron] from [Capitol House], Landlord or Affiliates under the Operating Agreement or the Project Documents or any Guarantor under the Guaranty Agreement.

24.

The obligations of Capitol House under the Purchase Agreement remain in full force and effect without regard to, and are not affected or impaired by, any termination, liquidation, or dissolution of the Company or Capitol House.

7

25.

Chevron has fully performed its obligations under the Purchase Agreement.

26.

Capitol House has breached the Purchase Agreement by failing to pay Chevron the Put Price within thirty (30) days of delivery of the Election Notice, and by failing to pay Chevron the Put Price, as demanded in the November 3, 2016 letter.

27.

As a direct and proximate cause of Capitol House's breach, Chevron has suffered, and will continue to suffer, damages in an amount to be determined at trial.

WHEREFORE, Chevron prays that this Court enter judgment against Capitol House in the amount of the Put Price as of the time judgment is entered, plus interest, costs, and attorneys' fees, and for such additional relief as the Court deems just and proper.

## COUNT II
## BREACH OF CONTRACT
### (Against The Foundation)

28.

Plaintiff repeats and realleges the allegations of paragraphs 1 through 27 as though fully set forth herein.

29.

The Guaranty is a valid and binding contract.

30.

Under the Guaranty, the Foundation unconditionally guaranteed to Chevron the prompt and full payment when due and punctual performance of the payment and other obligations described in the Guaranty. Specifically, the Foundation unconditionally and irrevocably guaranteed to Chevron, to the extent not paid by Capitol House, the punctual payment when due, and at all times thereafter, of each and every obligation of Capitol House to make any payment or advance any funds under the Purchase Agreement.

31.

If any of the payment obligations of Capitol House are not complied with, the Foundation agreed to indemnify and hold harmless Chevron from any and all Adverse Consequences that Chevron may suffer by reason of any such non-compliance by Capitol House. Adverse Consequences has the meaning set forth in the Operating Agreement for the Company, dated as of December 29, 2005, and means: "all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, reasonable amounts paid in settlement, liabilities, obligations, taxes, liens, losses, expenses and fees, including court costs and reasonable attorneys' fees and expenses."

32.

The Guaranty also provides that in the event of a default by Capitol House of its payment or performance obligations under the Purchase Agreement, the Foundation shall, on demand and without protest, pay the amount due to Chevron.

33.

The Foundation further agreed to pay on demand all reasonable attorneys' fees and other costs and expenses incurred by Chevron in the enforcement of or preservation of Chevron's rights under the Guaranty. And the Foundation agreed to pay interest on any expenses or other sums due to Chevron under the Guaranty that are not paid when due, at an annual rate equal to the Designated Prime Rate plus three percent (3%).

34.

The Guaranty is an absolute, irrevocable and unconditional guaranty of payment and performance, and the Foundation is liable for the payment and performance of the obligations of Capitol House under the Purchase Agreement as the primary obligor.

35.

The Guaranty is binding not only on the Foundation, but also on the Foundation's heirs, personal representatives, successors and assigns.

36.

The Guaranty provides that "neither [Chevron's] rights or remedies nor such [Foundation's] obligations under the terms of this Guaranty shall be released, diminished, impaired, reduced or affected by . . . and the liability of the [Foundation] under this Guaranty shall be absolute and unconditional irrespective of . . . the . . . insolvency, . . . dissolution, liquidation, termination, . . . sale of all or substantially all of the assets, or lack of corporate, partnership or

other power of the [Foundation], [Capitol House], the Landlord, the Company or any other party at any time liable for the payment or performance of any or all of the Guaranteed Obligations."

37.

The Guaranty also provides that "[t]he obligations of the [Foundation] hereunder shall survive the termination of the Operating Agreement, the occurrence of a Terminating Event as to the Managing Member thereunder or the sale, assignment or other transfer of the Interest of [Chevron] in the Company until such time as the Guaranteed Obligations have been paid or performed in full."

38.

Chevron has fully performed its obligations under the Guaranty.

39.

The Foundation has breached the Guaranty by failing to pay Chevron each and every obligation of Capitol House to make any payment or advance any funds to Chevron under the Purchase Agreement, including payment of the Put Price.

40.

The Foundation has breached the Guaranty by failing to pay Chevron all reasonable attorneys' fees and other costs and expenses incurred by Chevron in the enforcement of or preservation of Chevron's rights under the Guaranty.

41.

As a direct and proximate cause of the Foundation's breaches, Chevron has suffered, and will continue to suffer, damages in an amount to be determined at trial.

42.

The Foundation must also indemnify and hold harmless Chevron from any and all Adverse Consequences, as that term is defined above, including payment of all court costs and reasonable attorneys' fees and expenses incurred by Chevron in this action.

WHEREFORE, Chevron prays that this Court enter judgment against the Foundation in the amount of the Put Price as of the time judgment is entered, plus interest, costs, and attorneys' fees, and for such additional relief as the Court deems just and proper.

*Dated: August 17, 2018.*

Respectfully submitted by:

**DONOHUE, PATRICK & SCOTT, P.L.L.C.**

  s/ Kirk A. Patrick, III

KIRK A. PATRICK, III (#19728), kpatrick@dps-law.com

BLAKE A. ALTAZAN (#31595), baltazan@dps-law.com
450 Laurel Street, Suite 1600
Baton Rouge, Louisiana 70801

P.O. Box 1629
Baton Rouge, Louisiana 70821-1629
Telephone: (225) 214-1908
Facsimile: (225) 214- 3551

*Attorneys for Chevron TCI, Inc.*