UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **CHEVRON TCI, INC.** | **CIVIL ACTION** |
| **VERSUS** | |
| | **NO. 18-776-BAJ-RLB** |
| **CAPITOL HOUSE HOTEL MANAGER, LLC, ET AL.** | |

**ORDER**

This matter is before the Court *sua sponte* following a telephone conference with the parties on April 2, 2020. (R. Doc. 8). This order addresses whether and to what extent Chevron TCI, Inc. must destroy certain documents produced by the non-party KPMG, LLP ("KPMG") on the basis that they are subject to the attorney-client privilege and/or work product immunity or are otherwise irrelevant.

**I.    Background**

This is a breach of contract action in which Chevron TCI, Inc. ("Plaintiff" or "CTCI") alleges that it is entitled to recover approximately $11 million from Capitol House Hotel Manager, LLC ("Capital House Manager") and/or the Wilbur Marvin Foundation ("WMF") (collectively, "Defendants"). (R. Doc. 1, "Compl.").

CTCI alleges that in 2005, it invested in Capitol House Hotel Operating Company, LLC ("Capital House Operator" or "Company") "which was formed to lease, hold, maintain, and operate a hotel and commercial space in downtown Baton Rouge, now known as the Hilton Capital Center." (Compl. ¶ 7). CTCI represents that the "project was eligible for the federal Historic Tax Credit (HTC) program, which encourages private sector investment in the rehabilitation and re-use of historic buildings." (R. Doc. 24-1 at 3).

1

Defendants represent that on December 19, 2005, Capital House Manager, Capital House Operator, and Capital House Hotel Development Company, LLC ("Capital House Owner") were organized as limited liability companies under Louisiana law. (R. Doc. 27-1 at 4). Defendants assert that Capital House Owner leased the hotel to Capital House Operator and "there was an historic tax credit pass-through agreement allowing CTCI to receive the income tax credits, even though the entity in which it invested (Operator) did not own the building that was being improved." (R. Doc. 27-1 at 4). CTCI represents that under Capital House Operator's operating agreement, Capital House Manager would manage Capital House Operator and CTCI would receive tax credits for an investment of $11,909,779, payable in two installments, which CTCI paid. (R. Doc. 24-1 at 3).

On December 29, 2005, CTCI entered into a Purchase Agreement with Capital House Manager with a six-month "put option period" to elect to sell its membership interest in Capital House Operator to Capitol House Manager. (Compl. ¶ 8; *see* R. Doc. 1-1).[1] That same day, CTCI also entered into a Guaranty Agreement with WMF in which WMF guaranteed all obligations of Capitol House Manager within the Purchase Agreement. (Compl. ¶ 9; *see* R. Doc. 1-2). The Purchase Agreement has been amended several times, with the seventh and final amendment providing that the purchase option period ended on December 31, 2015. (Compl. ¶ 10-11; *see* R. Docs. 1-3, 1-4). In addition, each of the Amended and Restated Purchase Agreements contains an acknowledgement that the Guaranty Agreement remains in full effect except to the extent the Purchase Agreement is amended. (Compl. ¶ 12; *see* R. Docs. 1-3, 1-4).

Capital House Operator was under IRS audits with respect to CTCI's claimed historic tax credit for the years 2006-2011. (R. Doc. 27-1 at 6). Defendants assert that during this audit

---

[1] Defendants' Answer asserts that Capital House Manager held a 0.1% interest and CTCI held a 99.9% interest in Capital House Operator. (R. Doc. 9 at 1).

CTCI took the position that it was a "true partner" with Capital House Operator and, accordingly, could avail itself of the full historic tax credit, but ultimately settled with the IRS by receiving two-thirds of the historic tax credit. (R. Doc. 27-1 at 6-7).

Defendants represent that on September 5, 2012, Capital House Owner and Capital House Operator "terminated the lease between them" and Capital House Owner sold the hotel, including fixtures and other assets, to a third party. (R. Doc. 27-1 at 5). Defendants assert that Capital House Operator "was terminated and dissolved" in light of the language of Section 2.5(A)(i) of its Operating Agreement. (R. Doc. 27-1 at 5).[2] Defendants further assert that CTCI consented to the sale and termination of the lease, and CTCI lost its right to a put option payment in light of the termination of Capital House Operator as an entity. (R. Doc. 27-1 at 6). CTCI argues that Louisiana law has additional requirements for the termination of a limited liability company, notwithstanding the language in Capital House Operator's Operating Agreement. (R. Doc. 33 at 3).

Capital House Operator was also under an IRS audit with respect to CTCI's claimed historic tax credit for the years 2012-2013. (R. Doc. 27-1 at 6-7). Defendants represent that during this audit CTCI signed a Form 870-PT agreeing with the IRS' conclusion that Capital House Operator was terminated as an entity in 2012 given the termination of the lease and sale of assets. (R. Doc. 27-1 at 7).

On November 19, 2015, CTCI demanded Capitol House Manager to purchase its interest in Capital House Operator for $10,554,519. (Compl. ¶ 13). Neither Capital House Manager nor

---

[2] Section 2.5(A)(i) of its Operating Agreement provides the following: "[Capital House Operator] shall continue in full force and effect until December 31, 2055, except that [Capital House Operator] shall be dissolved prior to such date upon the happening of . . . The termination or expiration of the Lease or the sale or other disposition of all or substantially all of the assets of [Capital House Operator] (including, without limitation, the Leasehold Interest)." (R. Doc. 42-2 at 31).

3

WMF paid the amount sought. (Compl. ¶ 14).  CTCI is now seeking recovery for breach of the Purchase Agreement and Guaranty Agreement.

**II.     The Instant Discovery Dispute**

The origin of the instant dispute is CTCI's Motion to Compel or Authorize Deposition and Production of Documents ("Motion to Compel") filed on November 1, 2019. (R. Doc. 46). That motion concerned whether and to what extent Shannon Kirkpatrick ("Kirkpatrick"), a CPA with KPMG, must provide testimony and documents in response to a Rule 45 subpoena.  In support of the Motion to Compel, CTCI represented that "[f]rom 2008 to 2013, Kirkpatrick prepared and filed all of the Company's tax returns, and through 2018, she continued to service the Company's and CTCI's tax needs (as CTCI was 99% owner of the Company) as it involved the Company." (R. Doc. 46-1 at 2).  CTCI specifically stated that it sought "to obtain any documents evidencing communications by and between Ms. Kirkpatrick, [Gary] Elkins, and/or attorney Douglas Draper or any of Manager's counsel from December 29, 2005, until the present date." (R. Doc. 46-1 at 6-7).

In partially opposing the motion, Defendants argued that while they also had an interest in obtaining documents and deposition testimony from Kirkpatrick, certain attorney-client communications after November 19, 2015 and information pertaining to WMF entities other than Capitol House Operating fall outside the scope of discovery. (R. Doc. 51).  In support of this position, Defendants referenced an October 21, 2019 letter from defense counsel to Plaintiff's counsel stating that any communications involving Kirkpatrick and/or Gary Elkins ("Elkins") or Doug Draper ("Draper") after November 19, 2015 fall within the scope of the attorney-client privilege. (R. Doc. 51 at 1; *see* R. Doc. 51-2).  Accordingly, the issue of whether such

4

communications are privileged was directly raised in Defendants' opposition to the Motion to Compel.

The Court set Plaintiff's Motion to Compel "for oral argument for the purpose of determining whether **any applicable privilege or work product rule**, whether raised by Defendants or the non-parties KPMG LLP and Shannon Kirkpatrick, protects the information sought from disclosure." (R. Doc. 74) (emphasis added). Defendants were provided the opportunity to argue on behalf of their assertions of both the accountant-client privilege and the attorney-client privilege. At oral argument, however, Defendants abandoned their arguments in support of either privilege. Defense counsel stated the following:

> **I will make this very easy for the Court**. Our concerns were after November of 2015 when Chevron exercised the put and – that fired Gary Elkins. . . . We were concerned that there might be communication with Ms. Kirkpatrick that might come within the **global privilege of both accountant and attorney**. Mr. Drapper indicates to me that he did not talk with her. . . . And Mr. Elkins has testified in his deposition about two or three conversations he had with her, **so we're not going to assert that privilege at all**. **We're just going to let the documents be produced. . . . So that's easy**.

(R. Doc. 88 at 28-29) (emphasis added). Defendants did not inform the Court that they had previously withheld various communications involving Kirkpatrick from their own productions on the basis of the attorney-client privilege and work product doctrine.[3]

On March 11, 2020, the Court found the accountant-client privilege inapplicable and ordered KPMG to produce the documents sought by the parties. (R. Doc. 78).[4] The information sought pursuant to the subpoena included (1) "Any and all documents concerning the 2012 Tax Returns for Operator"; (2) "Any and all documents concerning or related to the Form 1065X –

---

[3] Defendants produced a copy of their privilege log to CTCI on September 19, 2019. (R. Doc. 94-11). Accordingly, Defendants were aware of the scope of communications between their counsel and Kirkpatrick prior to the filing of CTCI's Motion to Compel on November 1, 2019 (R. Doc. 46) and oral argument held on that motion on March 2, 2020 (R. Doc. 77).
[4] None of the parties objected to this order pursuant to Rule 72(a) of the Federal Rules of Civil Procedure.

5

Amended Return or Administrative Adjustment Request . . . referred to as the 2012 Amended Return for Operator"; and (3) "Any and all documents evidencing any and all communications or Professional Actions by [Kirkpatrick] for Operator, which were generated after the filing of the 2012 Tax Returns for Operator until the Form 1065X . . . was filed." (R. Doc. 78 at 6).  The Court limited the scope of the documents and communications to those concerning Capital House Operator. (R. Doc. 78 at 6).

The Court also ordered KPMG to produce the following information sought by Defendants that was not explicitly detailed in CTCI's subpoena but still within its scope: (a) "any and all documents related to IRS NOPA (Notice of Proposed Adjustment) for the calendar years 2006, 2008, 2009, and 2010"; (b) "any and all documents related to IRS NOPA for calendar years 2007, 2011, 2012, and 2013"; (c) "any and all documents related to IRS requests to extend the statute of limitations for any of the years 2006 through 2013 in connection with negotiations of the NOPAs and [Kirkpatrick's] communication of those requests to CTCI, its counsel or other representatives and to Manager"; (d) "any and all documents related to the amendments to the Purchase Agreement between CTCI and Manager"; (e) "any and all documents related to CTCI's settlement with the IRS for years 2006 through 2011, including, but not limited to, Notices of Final Partnership Administration Adjustment ('FPAA') for years ending December 31, 2006, 2007, 2008, 2009, 2010 and 2011" and (f) "any and all documents related to negotiation and execution by CTCI of a Form 870-PT for years 2012 and 2013." (R. Doc. 78 at 7).

In ordering KPMG to produce the foregoing information, the Court held that regardless of whether federal or state privilege law is applicable in this action, the documents sought are not protected by the accountant-client privilege. (R. Doc. 78 at 8-13).  Importantly, the Court also observed that defense counsel withdrew Defendants' assertion of the attorney-client privilege at

6

oral argument and found the issue of the attorney-client privilege to be moot. (R. Doc. 78 at 13-14).

It is against this backdrop that Defendants are now seeking to claw back certain communications and other documents involving Kirkpatrick or otherwise produced by KPMG as attorney-client privileged or subject to the work product doctrine.

On March 25, 2020, after KPMG made its first production of documents, defense counsel sent correspondence to Plaintiff's counsel stating that some of the documents produced by KPMG had been previously withheld by Defendants as privileged with respect to their own productions. (R. Doc. 83-1). Defendants sought to claw back documents produced by KPMG that Defendants had previously withheld from their own production as privileged under Section X of the Protective Order in this action governing the exchange of confidential information. (*See* R. Doc. 23-1, "Protective Order"). On April 6, 2020, after KPMG made a second production, Defendants sought to claw back additional documents on the basis of the attorney-client privilege, work product doctrine, or irrelevance. (R. Doc. 90-1).

The parties submitted a status report to the Court discussing KPMG's production. (R. Doc. 83). The Court held a telephone conference and ordered the parties to file briefs with respect to the assertions that information produced by KPMG were subject to the attorney-client privilege or work product protective. (R. Doc. 86). The Court informed the parties that it was not inclined to revisit the issue of whether Defendants' assertions of privilege with respect to their own document productions are valid given the expiration of the discovery deadline. (R. Doc. 86 at 2). Any relief on that issue would have to be sought by separate motion. No motion was filed.

7

The parties have submitted briefing and various exhibits, including the documents at issue, for the Court's consideration. (*See* R. Doc. 90; R. Doc. 93 (under seal); R. Doc. 94; R. Doc. 97 (under seal); R. Doc. 102; R. Doc. 103 (under seal); and R. Doc. 115). Defendants are seeking to claw back three categories of documents produced by KPMG: (1) 14 items previously included on Defendants' privilege log and (2) 24 items that were "not previously in Capital House's possession" and not otherwise identified on Defendant's privilege log; and (3) 7 pages of documents that were "not properly produced because they relate to legal entities other than Capital House Operating Company, LLC." (R. Doc. 90-1).

### III. Law and Analysis

#### A. Procedures Regarding Claims of Privilege Over Information Produced in Response to Subpoena

As an initial matter, CTCI argues "there was no ground to request a claw back under Section X [of the Protective Order] as that provision specifically dealt with an inadvertent disclosure of privileged materials by CTCI or the Defendants, not KPMG, the parties' tax professional, which voluntarily produced responsive documents (as ordered by the Court)." (R. Doc. 90 at 4). In response, Defendants argue that "[t]he claw back provision previously utilized by both parties seemed the reasonably and obvious mechanism to address this situation since there is no procedure in place for when a third-party produces documents to two parties and asks them to work out privilege issues." (R. Doc. 94 at 7 n. 21).

CTCI is correct that Section X of the Protective Order does not provide any specific procedures with respect to claims of privilege over documents produced by a third-party in response to a subpoena. However, Defendants' claim of privilege over any documents produced by KPMG falls within the province of Rule 45(e)(2)(B) of the Federal Rules of Civil Procedure,

which specifically provides that a party may seek to claw back privileged or protected information that was produced by a third-party in response to a subpoena:

> If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

Fed. R. Civ. P. 45(e)(2)(B); *see also* Fed. R. Civ. P. 26(b)(5)(B) (identical requirements with respect to "information produced in discovery"). Defendants' March 25, 2020 and April 6, 2020 letters notified CTCI of the claims of privilege and, accordingly, triggered the requirement set forth in Rule 45(e)(2)(B). (R. Docs. 83-1, 90-1).

As ordered by the Court, CTCI has produced the documents in dispute under seal for a determination of whether Defendants' claims of privilege and work product protection are merited. (R. Doc. 93 at 1-115) (under seal). The Court will now turn to whether the asserted privilege and/or protections apply to those documents.

### B. Attorney-Client Privilege

Rule 501 of the Federal Rules of Evidence requires a federal court sitting in diversity to apply the appropriate state's law concerning the scope and application of the claimed attorney-client privilege. It appears that there is no dispute that Louisiana law governs attorney-client privilege in this action.[5]

---

[5] The Court did not conclusively determine whether federal or state law governed privilege in this action in its previous ruling on the Motion to Compel. (R. Doc. 78 at 8-9). Regardless, "federal common law and Louisiana statutory law are materially similar concerning the attorney-client privilege." *Akins v. Worley Catastrophe Response, LLC*, No. 12-2401, 2013 WL 796095, at *11 (E.D. La. Mar. 4, 2013).

9

>The Louisiana Code of Evidence states:
>
>A client has a privilege to refuse to disclose, and to prevent another person from disclosing, a confidential communication . . . made for the purpose of facilitating the rendition of professional legal services to the client, as well as the perceptions, observations, and the like, of the mental, emotional, or physical condition of the client in connection with such a communication . . . .

La. Code Evid. art. 506(B). Under Louisiana law, both the client and his or her lawyer or the lawyer's representative may claim the privilege. La. Code Evid. art. 506(D). The party asserting the privilege has the burden of proving its applicability and that a waiver has not occurred. *Smith v. Kavanaugh, Pierson & Talley*, 513 So.2d 1138, 1143 (La. 1987).

The attorney-client privilege "was intended as a shield, not a sword." *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989). As such, when the privilege holder makes a confidential communication a material issue in litigation, "fairness demands treating the defense [or claim] as a waiver of the privilege." *Conkling*, 883 F.2d at 434; *see also Asset Funding Group, LLC v. Adams & Reese, LLP*, No. 07-2965, 2008 WL 4186884, at *4 (E.D. La. Sept. 9, 2008) ("Waiver includes conduct which would make it unfair for the client to insist on the privilege thereafter."); *Nguyen v. Excel Corp.*, 197 F.3d 200, 207 n.18 (5th Cir. 1999) (recognizing "a client's inability to, at once, employ the privilege as both a sword and a shield."). In other words, a waiver occurs when the holder pleads a claim or defense in such a way that it will inevitably have to "draw upon a privileged communication in order to prevail." *Conono Inc. v. Boh Bros. Const. Co.*, 191 F.R.D. 107, 110 (W.D. La. 1998).

There is no dispute that Defendants produced a copy of their privilege log to CTCI on September 19, 2019. (R. Doc. 94-11). This privilege log includes 644 entries consisting mostly of e-mails and attachments (including emails involving Kirkpatrick, Elkins, and Draper) dated after November 19, 2015. Defendants were aware of the scope of the communications involving

Kirkpatrick that were withheld as privileged from their own production.  It is therefore unclear why these specific assertions of privilege were not raised in Defendants' written opposition to CTCI's Motion to Compel or at oral argument on that motion.  It is also unclear why some of these communications with Kirkpatrick do not appear on Defendants' privilege log.[6]  What is clear is that Defendants waived the attorney-client privilege at oral argument with respect to communications involving Kirkpatrick that were responsive to the information sought in CTCI's subpoena or otherwise sought by Defendants.  (*See* R. Doc. 88 at 28-29).  This finding is sufficient to resolve the instant dispute.

Even if Defendants did not waive the attorney-client privilege at oral argument, however, they have nevertheless failed to meet their burden of establishing that the documents produced by KPMG are protected by the attorney-client privilege for the following reasons.

First, "the attorney-client privilege may not be tossed as a blanket over an undifferentiated group of documents. . . . The privilege must be specifically asserted with respect to particular documents." *United States v. El Paso Co.*, 682 F.2d 530, 538-39 (5th Cir. 1982) (internal citations omitted).  Here, Defendants do not explain why each of the specific communications at issue are subject to the attorney-client privilege.  While the Court ordered the documents at issue to be filed under seal, the Court did not state that it would make privilege determinations in the absence of specific arguments.  The burden to prove the existence of the attorney-client privilege remained on Defendants.  While Defendants have made certain attempts to identify individuals involved in the communications and generally discuss the subject matter

---

[6] Defendants assert that these communications were not identified in their production and privilege log because they "maintained that everything after November 19, 2015 was privileged" and, accordingly, "discovery searches were not conducted during that nonresponsive timeframe." (R. Doc. 94 at 11).  Defendants' own privilege log, which primarily lists documents dated after November 19, 2015 and included communications between Kirkpatrick and defense counsel, belies that assertion.

11

of the communications, they do not address why each of the communications at issue is protected under the attorney-client privilege.

Second, Defendants have failed to convince the Court that Kirkpatrick acted specifically on behalf of Capital House Manager to the exclusion of Capital House Operator, and, by extension, CTCI. At oral argument on CTCI's Motion to Compel, counsel for Kirkpatrick and KPMG stated that KPMG prepares tax returns for, and has an accountant relationship with, Capital House Operator. (R. Doc. 88 at 19). Consistent with this representation, the Court's order on CTCI's Motion to Compel provided that "[t]here is no dispute that Capital House Operator, as well as its members, CTCI and Capital House Manager, are 'clients' of Kirkpatrick and KPMG."). (R. Doc. 78 at 11). The communications at issue specifically concern Capital House Operator. Defendants have raised no compelling argument in support of a finding that these communications are shielded from discovery by CTCI, the majority member of Capital House Operator.

At most, Defendants assert that "[a]s of November 19, 2015, CTCI and Manager and WMF were adverse to each other, and Elkins and [Yvonne] Chalker no longer represented Operator." (R. Doc. 94 at 8). That may be the case. It is unclear, however, why Capital House Manager did not immediately seek the assistance of an independent accounting firm when it determined that its interests were adverse to those of CTCI. Even if their attorneys no longer represented Capital House Operator after November 19, 2015, Defendants have not established that Kirkpatrick and/or KPMG no longer had an accountant-client relationship with Capital House Operator and/or CTCI after that date, such that Capital House Manager can claim a

privilege regarding communications pertaining to Capital House Operator to the exclusion of its fellow member.[7]

Third, Defendants have not established that communications between their attorneys and Kirkpatrick relating to the preparation of an amended tax return and Form 870-PT for Capital House Operator were "made for the purpose of facilitating the rendition of professional legal services to the client." La. Code Evid. art. 506(B); *see El Paso*, 682 F.2d at 539 ("[T]he preparation of tax returns is generally not legal advice within the scope of the privilege."). In other words, Defendants have not established that Kirkpatrick's assistance was necessary for Defendants to consult with their attorneys, which included counsel with expertise in tax law. *See Smith*, 513 So.2d at 1143.

Fourth, any attorney-client privilege has been waived on the basis that the communications involving Capital House Operator have been placed at issue by Defendants. "Placing-at-issue waiver occurs when a privilege-holder pleads a claim or a defense in such a way that he will be forced inevitably to draw upon a privileged communication at trial in order to prevail. Consequently, he places at issue and waives his privilege as to communications on the same subject under his control." *Smith*, 513 So.2d at 1145. The "at issue" waiver is rooted in fairness—when the holder places the information at issue to his own benefit, allowing "the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party." *Conkling,* 883 F.2d at 434. Ultimately, the question is whether the privilege holder has committed itself to a course of action that will require the disclosure of a privileged communication. *Smith,* 513 So.2d at 1146.

---

[7] The Court is aware that it is Defendants' litigation position that Capital House Operator was dissolved on September 5, 2012. That issue has not been resolved on the merits.

It appears that most of the communications at issue involve the 2012 amended tax return and the creation of the Form 870-PT. Defendants put these communications at issue in light of their Fifth Affirmative Defense, which alleges the following:

> CTCI contemporaneously consented to the sale of the Hotel by Owner, the termination of the leasehold interest between Operator and Owner, and to the sale of all of the assets of Operator, such as furniture, fixtures, trade receivables, etc. Specifically, Alan E. Levine of CTCI agreed to the termination of the lease and the sale of all of the assets of Operator in a Resolution executed on or about September 5, 2012 and the Lease Termination Agreement. In March of 2018, CTCI again agreed with Manager and the IRS that Operator terminated in 2012, when it agreed to an amended tax return (Form 872-PT) for Operator for the year 2012 showing termination and dissolution in 2012. Thus, CTCI has waived any rights and/or is estopped from asserting any claims inconsistent with its consent. CTCI has agreed Operator was dissolved on September 5, 2012.

(R. Doc. 9 at 3). Communications with respect to the 2012 amended tax return and Form 872-PT for Capital House Operator have been put at issue and the attorney-client privilege does not shield these communications. These communications bear upon whether CTCI "agreed" with Capital House Manager with respect to the alleged dissolution of Capital House Operator.

Based on the foregoing, the Court finds that Defendants have not established the attorney-client privilege protects the communications involving Kirkpatrick produced by KPMG.

## C.   Work Product Protection

Rule 26(b)(3) of the Federal Rules of Civil Procedure restricts a party's ability to obtain work product from an opponent during discovery. Work product consists of "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A). The work product protection is broader in scope and reach than the attorney client privilege. The attorney client privilege "extends only to client communications, while the work product protection encompasses much that has its source

outside client communications." *Stoffels v. SBC Communications, Inc.*, 263 F.R.D. 406, 412 (S.D. Tex. 2009).

Work product protections "are held by both the attorney as well as the client" and may be asserted and waived by either. *In re Grand Jury Subpoenas*, 561 F.3d 408, 411 (5th Cir. 2009). Rule 26(b)(3) distinguishes between "ordinary" and "opinion" work product. The party seeking disclosure of opinion work product is subject to a higher burden because opinion work product reveals the "mental impressions, conclusions, opinions, or legal theories of an attorney." *Conoco Inc.*, 191 F.R.D. at 118 (quotations omitted). This protection is not absolute, however. Like the attorney client privilege, opinion work product may be disclosed when the holder waives the protection by placing the protected material "at issue" in the litigation. *Id.* at 118. The party seeking discovery of opinion work product must show a compelling need for the information and an inability to obtain it otherwise. Fed. R. Civ. P. 26(b)(3).

Defendants claim that two documents provided to Kirkpatrick – a letter from defense counsel dated September 28, 2018 and a memorandum that appears to be written by Elkins on August 28, 2018 – constitute "inadvertent productions" of protected work product. (R. Doc. 94 at 11). The record provides otherwise. The September 28, 2018 letter was voluntarily sent that same day by Ty McMains (Defendants' in-house counsel) to Kirkpatrick and provides instructions for Kirkpatrick to complete. (*See* R. Doc. 93 at 98-101; Bates Nos. KPMG-WLIBUR-0010611-10614). The August 28, 2018 memorandum was voluntarily sent on August 29, 2018 by Jerry Jolly ("Jolly")[8] to Kirkpatrick for review. (*See* R. Doc. 93 at 36-48, Bates Nos.

---

[8] Defendants represent that Jolly "is a CPA who has been retained by Capital House [Manager] to assist in this litigation." (R. Doc. 94 at 7).

15

KPMG-WILBUR-0010004-0010016). Capital House Manager voluntarily provided the foregoing documents to Kirkpatrick.[9] These were not inadvertent productions.

Similar to Defendants' assertions of the attorney-client privilege, the Court concludes that Defendants have not established the applicability of work product protection or otherwise waived any protections by disclosing the documents to Kirkpatrick and KPMG.

### D. Irrelevant Information Pertaining to WMF Entities other than Capitol House Operating

While not specifically ordered to do so, the parties have also briefly addressed the issue of whether certain documents produced by KPMG should be clawed back on the basis of irrelevance. CTCI detailed its positions with respect to these documents in correspondence dated April 9, 2020. (*See* R. Doc. 93 at 116-19) (filed under seal). CTCI directed the Court to these arguments in its opening brief. (R. Doc. 94 at 14-15). Defendants argument on the issue is as follows:

> Finally, KPMG inadvertently produced several documents which are accountant privileged documents for entities other than Operator, specifically WMF or Capitol House Hotel, LLC. CTCI argues that these documents mention Operator and, thus, they are relevant. A mention of Operator is not sufficient to deprive[ ] separate entities of their accountant privilege. These items are not the accounting documents of Operator and should similarly be destroyed.

(R. Doc. 94 at 11).

The Court finds Defendants' arguments to be unconvincing in the context of the instant third-party production. The documents were produced by KPMG only after the parties agreed upon appropriate search terms to obtain responsive documents. (*See* R. Doc. 79). The April 9, 2020 letter (filed under seal) outlines how the content of the documents relate to the Capitol

---

[9] Defendants assert that they Capital House Manager "did not know KPMG had these documents" prior to their production to CTCI by KPMG. (R. Doc. 94 at 11). It is unclear how that can be the case given that Capital House Manager's own in-house counsel and representative provided the documents to Kirkpatrick.

16

House project, tax returns for the Operator, the contested "dissolution," and other allegations in this matter. R. Doc. 93 at 118-19. Defendants raise no specific arguments regarding the irrelevance of these documents or any undue harm in light of their production. Defendants do not identify the entities that are seeking accountant-client privilege protection over the produced documents. Given the record, the Court finds no basis for requiring these documents to be destroyed or returned on the basis of irrelevance.

## IV. Conclusion

Based on the foregoing,

**IT IS ORDERED** that CTCI need not return or destroy any of the documents produced by KPMG in accordance with the Court's Order.

Signed in Baton Rouge, Louisiana, on May 20, 2020.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**