## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**CHEVRON TCI, INC.**                                    CIVIL ACTION

**VERSUS**

**CAPITOL HOUSE HOTEL MANAGER,**            NO. 18-00776-BAJ-RLB
**LLC, ET AL.**

### RULING AND ORDER

Before the Court are cross-motions for summary judgment: Plaintiff Chevron TCI, Inc.'s **Motion for Summary Judgment (Doc. 110)** (*See also* Doc. 121–Doc. 121-32; Doc. 125); and Defendants Capitol House Hotel Manager, LLC's and The Wilber Marvin Foundation's joint **Motion for Summary Judgment (Doc. 163).** (*See also* Doc. 120–Doc. 120-21; Doc. 128). The Motions are opposed. (Doc. 132; Doc. 132-1; Doc. 134; Doc. 135; Doc. 144; Doc. 155; Doc. 156; Doc. 158). For the reasons stated herein, each motion is granted in part.

## I.  RELEVANT BACKGROUND

This case centers on a contractual dispute arising from a failed real estate venture. Defendants Capitol House Hotel Manager, LLC ("Manager"), and The Wilbur Marvin Foundation ("WMF")[1] (collectively, "Defendants") sought to restore an old, abandoned hotel in downtown Baton Rouge. (Doc. 110-1, ¶¶ 8–10;

---

[1] WMF is a 501(c)(3) non-profit entity that has participated in various commercial development projects throughout Baton Rouge. (Doc. 110-1, ¶¶ 3, 6; Doc. 135, ¶¶ 3, 6).

Doc. 135, ¶¶ 8–10). To accomplish the rehabilitation and restoration of the Hotel, additional capital was needed over and above conventional bank financing and other funding sources. (Doc. 163-1, ¶ 2; Doc. 132-1, ¶ 2). The use of historic tax credits and associated capital contributions, generated as a result of obtaining such credits, was sought to bridge the gap between the total cost of the project and the sum that a traditional lender would be willing to advance pursuant to a loan secured by a mortgage. (Doc. 163-1, ¶ 2; Doc. 132-1, ¶ 2). On November 4, 2004, Plaintiff expressed interest in investing in the "rehabilitation of the historic Capitol House Hotel in Baton Rouge, Louisiana." (Doc. 121-29).

### a. Entities Involved

Gary J. Elkins, Esq. ("Elkins"), an attorney "specializing in tax credits available through programs of the federal government," was hired to assist in securing financing. (Doc. 163-1, ¶ 3; Doc. 132-1, ¶ 3). In doing so, Elkins formed the following LLCs: (1) Defendant Manager; (2) Capitol House Hotel Operating Company, LLC ("Operator"); and (3) Capitol House Hotel Development Company, LLC ("Owner").[2] (Doc. 163-1, ¶¶ 1, 7; Doc. 132-1, ¶¶ 1, 7). Owner owned the real estate and bricks and mortar of the Hotel. (Doc. 163-1, ¶ 8; Doc. 132-1, ¶ 8). Operator leased the Hotel from Owner pursuant to a Master Lease Agreement, and owned the furniture, fixtures, and equipment. (Doc. 163-1, ¶¶ 8, 40; Doc. 132-1, ¶¶ 8, 40). Plaintiff and Manager, Defendant herein, became co-owners of Operator.

---

[2] Manager is a subsidiary of Capitol House Hotel, L.L.C. (Doc. 110-1, ¶ 2; Doc. 135, ¶ 2; Doc. 94-1). Capitol House Hotel, L.L.C. is a subsidiary of WMF. (Doc. 110-1, ¶ 2; Doc. 135, ¶ 2; Doc. 94-1).

(Doc. 110-1, ¶ 20; Doc. 135, ¶ 20).

### b. Contracts in Place

Operator filed its Articles of Organization and Initial Report with the Louisiana Secretary of State on December 13, 2005. (Doc. 110-1, ¶ 23; Doc. 135, ¶ 23). After more than one year of negotiations, the parties executed the relevant documents for the "Capitol House transaction" on December 29, 2005. (Doc. 132-1, ¶ 8; Doc. 144, ¶ 8).

On December 29, 2005, Plaintiff and Manager executed the Operating Agreement for Operator, pursuant to which Plaintiff, as the "Investor Member," became the owner of 99.9% of the membership interests in Operator, and Manager, as the "Managing Member," became the owner of .1% of the membership interests in Operator. (Doc. 163-1, ¶ 11; Doc. 132-1, ¶ 11).

Also on December 29, 2005, Plaintiff and Manager executed a "Purchase Agreement," containing "put" rights in favor of Plaintiff, and "call" rights in favor of Manager.[3] (Doc. 163-1, ¶ 10; Doc. 132-1, ¶ 10). On May 31, 2007 Plaintiff and Manager executed an Amended and Restated Purchase Agreement (the "May 31 Amended Purchase Agreement"). The May 31 Amended Purchase Agreement was subsequently amended multiple times, as discussed below.

Also relevant here, Plaintiff and WMF executed a Guaranty Agreement on

---

[3] Generally, a "put option" is an "option to sell something (esp. securities) at a fixed price even if the market declines; the right to require another to buy." *Option*, *Black's Law Dictionary* (11th ed. 2019). Generally, a "call option" is an "option to buy something (esp. securities) at a fixed price even if the market rises; the right to require another to sell — often shortened to call." *Option*, *Black's Law Dictionary* (11th ed. 2019).

December 29, 2005, whereby WMF, as guarantor, guaranteed various obligations set forth in the Purchase Agreement. (Doc. 163-1, ¶ 12; Doc. 132-1, ¶ 12; Doc. 121-3).

### c. Sale of Hotel

During July and August 2012, Manager was "working on" selling the Hotel. (Doc. 163-1, ¶ 23; Doc. 132-1, ¶ 23). On September 5, 2012, the Hotel was sold to a third party. (Doc. 163-1, ¶ 38; Doc. 132-1, ¶ 38). To accomplish the sale, the Master Lease between Owner and Operator had to be terminated. (Doc. 163-1, ¶ 39; Doc. 132-1, ¶ 39). Plaintiff consented to the sale and to the termination of the Master Lease. (Doc. 163-1, ¶ 39; Doc. 132-1, ¶ 39). Substantially all of Operator's assets were thereafter sold to the third-party purchaser of the Hotel. (Doc. 163-1, ¶¶ 40–41; Doc. 132-1, ¶¶ 40–41).

### d. IRS Involvement

The parties structured the historic tax credit financing through a two-tiered transaction, wherein the tax credits available to Owner were passed from it to Operator and then allocated to Plaintiff pursuant to a HTC Pass-Through Agreement. (Doc. 163-1, ¶ 13; Doc. 132-1, ¶ 13).

In 2012, the United States Court of Appeals for the Third Circuit issued a decision casting doubt on whether such structures qualified for historic tax credits. *See Historic Boardwalk Hall, LLC v. Comm'r*, 694 F.3d 425 (3d Cir. 2012), *cert. denied*, 133 S.Ct. 2734 (2013). In the same year, the IRS sent a Notice of Proposed Adjustment ("NOPA") to Manager's power of attorney, KPMG, regarding Operator's federal taxes for the years 2006 through 2011, challenging Operator's

partnership structure for tax purposes. (Doc. 110-1, ¶¶ 62–63; Doc. 135, ¶¶ 62–63; Doc. 121-25).

Elkins appeared at Manager's Federal Rule of Civil Procedure 30(b)(6) deposition and testified, on behalf of Manager, that the transaction at issue in this case was a pre-*Boardwalk* structure, and the "[IRS] was "attacking pre-[*Boardwalk*] transactions exactly like this" because the IRS "took the position that under this structure [. . .], a tax credit investor that had everything guaranteed and everything backstopped from the developer was not a partner in the partnership, did not have up side potential or down side risk, that everything was capped and protected and packaged." (Doc. 120-4, p. 8). Separately, in an Affidavit, Elkins stated: "The issue presented by the NOPAs was whether [Plaintiff] was a true partner with risk of loss as presented by the structure of the deal that closed on December 29, 2005 . . ." (Doc. 120-5, p. 5–6).

During July and August 2012, around the time that Manager was "working on selling the Hotel," Plaintiff's counsel, Holland & Knight, and KPMG were working on a response to the June 4, 2012 NOPA. (Doc. 163-1, ¶¶ 23; 31; Doc. 132-1, ¶¶ 23; 31). Manager hired Elkins to assist KPMG in the response to the June 4, 2012 NOPA on behalf of Operator. (Doc. 163-1, ¶ 32; Doc. 132-1, ¶ 32). The parties ultimately sent their response to the IRS on December 1, 2012. (Doc. 163-1, ¶ 31; Doc. 132-1, ¶ 31).

Ultimately, the parties' involvement with the Hotel effectively came to an end when the Hotel was sold in 2012, along with the furniture, fixtures, and equipment. (Doc. 163-1, ¶ 38, 40–41; Doc. 132-1, ¶ 38, 40–41). However, after this time, the

parties continued to regularly renew their May 31 Amended Purchase Agreement. (*See* Doc. 121-5).

## II. PROCEDURAL HISTORY

On August 17, 2018, Plaintiff initiated this action against Defendants Manager and WMF. (Doc. 1).

On May 1, 2020, the parties filed their cross-Motions for Summary Judgment. (Doc. 110; Doc. 163). The parties' dispute centers around several key contractual provisions: (1) the Put Option; (2) the Priority Return; (3) the Special Tax Distribution; (4) Asset Management Fees; and (5) the Guaranty.[4]

### a. Contractual Provisions at Issue

#### i. *Put Option*

Paragraph 2(a) of the May 31 Amended Purchase Agreement contains a "put" option whereby Plaintiff could sell its interest in Operator to Manager, pursuant to the following terms:

2. Put Option

(a) The Purchaser hereby grants to the Investor Member an option (the "Put") to sell the Membership Interest of the Investor Member to the Purchaser upon the terms and conditions hereinafter set forth.

(Doc. 163-1, ¶ 15; Doc. 132-1, ¶ 15). Paragraph 2(b) of the same agreement placed a time limit on when the Put Option could be exercised by Plaintiff. It provides:

(b) The Put may be exercised by the Investor Member at any time during the six (6) months beginning on January 1, of the sixth calendar year

---

[4] Generally, a guaranty is a "promise to answer for the payment of some debt, or the performance of some duty, in case of the failure of another who is liable in the first instance . . ." *Guaranty*, *Black's Law Dictionary* (11th ed. 2019).

6

beginning after the year in which the QRE Completion Date[5] occurs (or, if earlier, the date of dissolution of the Company) (the "Put Option Period").

(Doc. 163-1, ¶ 16; Doc. 132-1, ¶ 16).

Paragraph 2(d) of the May 31 Amended Purchase Agreement provides:

(d) Within thirty (30) days after delivery to [Manager] of an Election Notice from [Plaintiff], [Manager]shall pay to [Plaintiff] a purchase price (the "Put Price") in immediately available funds (with interest thereon at the Designated Prime Rate commencing on the 30th day following the date of such delivery) in the amount of twenty percent (20%) of [Plaintiff's] Capital Contribution to the Company plus the amount of any unpaid Asset Management Fees, Special Tax Distributions, and Priority Return and interest thereon owed to [Plaintiff] through the date of payment of the Put Price, and amounts, if any, due to [Plaintiff] from [Manager], Landlord or Affiliates under the Operating Agreement or the Project Documents or any Guarantor under the Guaranty Agreement, including, without limitation, any amounts owed under Sections 5.3 and 5.4 of the Operating Agreement.

(Doc. 110-1, ¶ 37; Doc. 135; ¶ 7; Doc. 121-4, p. 2).

In the years to follow, the May 31 Amended Purchase Agreement was revised multiple times. Most relevant here, on February 24, 2015, the parties entered into a Seventh and final Amendment to the May 31 Amended Purchase Agreement, which stated: "The Put may be exercised by the Investor Member at any time prior to December 31, 2015 (the 'Put Option Period')." (Doc. 121-5, p. 25–28). On November 19, 2015, Plaintiff notified Manager that Plaintiff was exercising its Put Option under the Purchase Agreement as amended. (Doc. 163-1, ¶ 59; Doc. 132-1, ¶ 59).

---

[5] The Operating Agreement defines "QRE Completion Date" as the date on which the last qualified rehabilitation expenditures with respect to the Building is placed in service for purposes of Section 47 of the Code. (Doc. 121-6, p. 24).

### ii.    *Priority Return*

Plaintiff seeks the "Priority Return" from Manager as part of its claim for damages. (Doc. 163-1, ¶ 67; Doc. 132-1, ¶ 67). "Priority Return" is defined in the Operating Agreement as follows:

> "Priority Return" means a cumulative annual Distribution to the Investor Member (pro rated for periods of less than a full year) of an amount equal to (i) for the period beginning as of the Admission Date until the Completion Date, four percent (4%) and (ii) thereafter, three percent (3%), of its Adjusted Capital Contribution, payable from Cash Flow or Capital Proceeds in the manner set forth in Section 6.2, with interest at the rate of six percent (6%) per annum, compounded annually, from the date first due until the date paid; provided, however, the rate shall increase to twelve percent (12%) per annum, compounded annually, on the first anniversary of the Completion Date for all interest accruing on and after such date.

(Doc. 163-1, ¶ 68; Doc. 132-1, ¶ 68).

Cash Flow is defined in the Operating Agreement as follows:

> "Cash Flow" means the excess of Cash Receipts over Project Expenses. Cash Flow shall be determined separately for each Fiscal Year or portion thereof.

(Doc. 163-1, ¶ 69; Doc. 132-1, ¶ 69). Thus, "Cash Flow" means positive cash flow. (*Id.*).

"Capitol Proceeds" and "Capital Transaction" are defined in the Operating Agreement as follows:

> "Capital Proceeds" means the proceeds of a Capital Transaction.

> "Capital Transaction" means, with respect to the Lease or the Project:

> (i) a sale, assignment, or other disposition of all or substantially all of the Leasehold Interest;

> * * *

> (iv) the termination of the Lease prior to the expiration of its term;

> ....

(Doc. 163-1, ¶ 70; Doc. 132-1, ¶ 70).

Section 6.2(D) of the Operating Agreement provides the following regarding

"Unpaid Priority Returns":

> Unpaid Priority Returns; Notwithstanding anything to the contrary herein, if the unpaid Priority Return at the end of any Fiscal Year (including any interest owed with respect thereto) is greater than $366,293, then the excess amount of unpaid Priority Return (and accrued interest) over $366,293 (such excess being referred to herein as a "Priority Deficit) shall be advanced by [Manager] as a Project Expense Loan and immediately distributed to [Plaintiff].

(Doc. 121-6, p. 45).

### iii.    *Special Tax Distribution*

Plaintiff also seeks reimbursement of what is called a "Special Tax

Distribution," which is defined in Section 6.2(C) of the Operating Agreement:

> Notwithstanding anything to the contrary contained in this Section 6, in any Fiscal Year in which the Company generates Profits, Cash Flow or Capital Proceeds in an amount equal to the product of (i) the Profits allocable to a Member and (ii) the Applicable Tax Rate . . . If there is insufficient Cash Flow or Capital Proceeds in any Fiscal Year to pay any amount due to the Investor Member pursuant to the provisions of this Section 6.2C, the Managing Member shall advance the amount of the deficiency to the Company as a Project Expense Loan. For purposes of this Section 6.2C, the term "Applicable Tax Rate" shall mean the combined effective federal, state, and local income tax rate applicable to a Member in the Fiscal Year in which the Profits are allocated to the Member. Each of the Members shall notify the other Member, on or before December 31 of each Fiscal Year, of its Applicable Tax Rate for such Fiscal Year. If a Member fails to so notify the other Member, the Applicable Tax Rate for the previous Fiscal Year shall remain in effect. . . . If the Company has insufficient cash to make such a distribution, the Managing Member shall advance the amount of the deficiency to the Company as a Project Expense Loan.

(Doc. 163-1, ¶ 78; Doc. 132-1, ¶ 78). Plaintiff asserts that the amended 2012 tax return

allocated $4,311,144 in income to Plaintiff. Plaintiff asserts that 38% of that amount

9

($1,638,235) at its Applicable Tax Rate, plus interest, is due to Plaintiff under the Operating Agreement. (*Id.*).

### iv. *Asset Management Fee*

Plaintiff contends that it is owed an Asset Management Fee each year from 2012 until the present. (Doc. 163-1, ¶ 84; Doc. 132-1, ¶ 84). With Plaintiff's application of a 12% interest rate, Plaintiff is demanding over $91,000 in Asset Management Fees. (*Id.*). An "Asset Management Fee" is defined, in part, as a cumulative annual fee in the amount of $10,000, payable to Plaintiff as Investor Member, beginning on the Admission Date for Asset Management Services. (Doc. 163-1, ¶ 85; Doc. 132-1, ¶ 85). For years 2006, 2008, 2009, 2010, and 2011, an Asset Management Fee was paid by Operator to Plaintiff. (Doc. 163-1, ¶ 86; Doc. 132-1, ¶ 86).

### v. *Guaranty*

Plaintiff and WMF executed a Guaranty Agreement at the same time Plaintiff and Manager executed the Purchase Agreement and Operating Agreement. (Doc. 110-1, ¶ 26; Doc. 135, ¶ 26; Doc. 121-3). Additionally, in each of the seven Amendments to the May 31 Amended Purchase Agreement, WMF executed a Guarantor Acknowledgement, which states:

> The undersigned Guarantor acknowledges that the Guaranty is in full force and effect and the obligations of the Guarantor thereunder have not been modified except to the extent this [Amendment] amends the Purchase Agreement. Accordingly, the Guaranty will be construed as if the term "Purchase Agreement" as defined in the Guaranty refers to the Purchase Agreement as amended hereby.

(Doc. 110-1, ¶ 53; Doc. 135, ¶ 53; Doc. 121-5). The Guarantor Acknowledgements can

10

be found on p. 4, Section C(4) of each amendment to the May 31 Amended Purchase Agreement. (*Id.*). The Guaranty Agreement is provided in full in the record. (Doc. 121-3).

## III.    SUMMARY JUDGMENT STANDARD

A court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on motions for summary judgment, courts are required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Coleman v. Hous. Indep. School Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).

Here, the summary judgment issues exclusively involve disputed interpretations of contract. The operative contracts at issue each contain a choice of law provision requiring construction in accordance with Louisiana law. (Doc. 110-1, ¶ 34; Doc. 135, ¶ 34). Under Louisiana law "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046. "The words of a contract must be given their generally prevailing meaning." *Id.* art. 2047.

## IV. DISCUSSION

Plaintiff seeks summary judgment in its favor, asserting: (1) Defendants owe Plaintiff the Put because Plaintiff properly exercised its Put Option against Manager and WMF according to the terms of the Seventh Amendment to the May 31 Amended Purchase Agreement (Doc. 125, p. 15); (2) Defendants owe all accrued Priority Return payments plus interest to Plaintiff (*Id.* at p. 19); (3) Defendants owe Plaintiff its Special Tax Distribution (*Id.* at p. 20); (4) Defendants owe Plaintiff its Asset Management Fees (*Id.* at p. 22); and (5) WMF is bound to pay interest, attorneys' fees, and costs to Plaintiff (*Id.* at p. 23).

Defendants, in turn, seek dismissal of Plaintiff's action in its entirety, asserting the following main arguments: (1) Plaintiff is not entitled to the Put Option (Doc. 128, p. 7); (2) Plaintiff has no right to demand a Put price because Operator is dissolved (*Id.* at p. 8); (3) Plaintiff is owed nothing in Priority Returns (*Id.* at p. 12); (4) Plaintiff's applicable tax rate was 0% (*Id.* at p. 17); (5) all Asset Management Fees have been paid (*Id.* at Doc. 19); and (6) WMF is not liable to Plaintiff under the Guaranty (*Id.* at p. 20).

The Court considers each argument in turn.

### a. Put Option—Manager's Liability

#### i. *Plaintiff is entitled to exercise the Put Option*

Plaintiff argues that it is entitled to judgment on its claim for the Put Option under the plain language of the May 31 Amended Purchase Agreement and subsequent Amendments. (Doc. 125, p. 16). Plaintiff argues that the Purchase Agreement is not ambiguous and that there is no need to look beyond the four corners

of the document. (*Id.*). The Court agrees. The Seventh Amendment to the May 31 Amended Purchase Agreement, in effect at the time Plaintiff notified Manager that it was exercising its Put Option, states: "The parties desire to amend the Purchase Agreement as set forth herein." (Doc. 121-5, p. 25). The Seventh Amendment then extends the "Put Option Period" to "December 31, 2015." (*Id.*). The Seventh Amendment was signed by Carolyn Martin, as "member and manager" of Manager. (*Id.*).

Here, there is no doubt as to the meaning of the Put Option or the time in which it had to be exercised. Rather, the language is clear and unambiguous: "The Put may be exercised by the Investor Member at any time prior to December 31, 2015 (the 'Put Option Period')." (*Id.*). According to this plain language, Plaintiff was required to exercise its Put Option by December 31, 2015. On November 19, 2015, Plaintiff notified Manager that it was exercising its Put Option under the Purchase Agreement. (Doc. 163-1, ¶ 59; Doc. 132-1, ¶ 59). Accordingly, Plaintiff timely exercised its Put Option.

### ii.    *Defendants' attempts to avoid the Put Option are not convincing*

Defendants raise several objections to Plaintiff's arguments in order to avoid paying the Put. None, however, are convincing.

#### a) *Absolute Nullity*

To avoid the Put Option, Defendants argue that the Seventh Amendment to the May 31 Amended Purchase Agreement is an absolute nullity because it was confected for the "single purpose of convincing the IRS that [Plaintiff] and Manager were still partners in the dissolved venture." (Doc. 134, p. 11). Defendants contend

13

that the Amendments were "executed for the purpose of concealing Operator's true status," "to make Operator look like it was still a partnership." (*Id.*).

A contract is absolutely null when "it violates a rule of public order, as when the object of a contract is illicit or immoral. A contract that is absolutely null may not be confirmed. Absolute nullity may be invoked by any person or may be declared by the court on its own initiative." La. Civ. Code art. 2030. In Louisiana, lawful cause is a required element for formation of a valid contract. *Id.* art. 1966; *see also Lowery v. Divorce Source, Inc.*, No. CIV.A. 15-1120, 2015 WL 5321758, at *2 (E.D. La. Sept. 11, 2015). A contract that lacks lawful cause is an absolute nullity, meaning that it cannot be confirmed by the parties. La. Civ. Code arts. 29, 30. An absolutely null contract is treated as if it were never made, and the parties are restored to the positions they occupied before the contract. *Id.* art. 2033. Cause is defined as "the reason why a party obligates himself." *Id.* art. 1967. The cause of an obligation is unlawful when enforcement of the obligation would result in a violation of a law or public policy. *Id.* art. 1968.

Here, the parties testified that their intention in extending the May 31 Amended Purchase Agreement was to maintain the partnership. Plaintiff's former president, Alan Levine, testified to the following:

> Q. And that's because it was important for the partnership to look like it was in existence for the IRS?

> A. I think the partnership needed to be in a position where it could defend its position and had to -- would maintain the partnership.

(Doc. 120-7, p. 18; Doc. 110-1, ¶ 60; Doc. 135, ¶ 60). Martin, manager of Manager, testified to the following in her 30(b)(6) deposition as corporate representative of

Manager: "I thought that 'we' as in Mr. Levine and I were trying to make it look like a partnership for the IRS." (Doc. 121-21, p. 13). Martin testified that she "agreed to help [Levine] make it look like a partnership. Absolutely. [Plaintiff] did a great thing helping us do this hotel and we were trying to return the favor and hoped that they wouldn't lose all of these tax credit deals . . ." (*Id.*). Defendants now assert that the Amendments are absolutely null because they were executed to make Operator look like a partnership. (Doc. 134, p. 11).

Louisiana Civil Code article 12 provides: "Persons may not by their juridical acts derogate from laws enacted for the protection of the public interest. Any act in derogation of such laws is an absolute nullity." *See also* Ronald J. Scalise, Jr., *Rethinking the Doctrine of Nullity*, 74 LA. L. REV 663, 692 (2014). For example, a contract for illicit drugs is absolutely null. *Id.* (citing La. Civ. Code art. 1968). Similarly, a promissory note given as evidence of money owed on unlawful gambling debts contains an unlawful cause and is thus an absolute nullity. *Id.* (citing *Mobley v. Harrel*, 571 So. 2d 662 (La. Ct. App. 1990)). Louisiana courts have also annulled contracts where an attorney, by entering into the agreement with a client, breaches his fiduciary duty. *Davis v. Parker*, 58 F.3d 183, 190 (5th Cir. 1995) (citing *Succession of Crowe*, 602 So. 2d 243, 246–47 (La. App. 2d Cir. 1992) ("A transaction between an attorney and a client is closely scrutinized and may be annulled even though the same transaction with a non-client without overreaching may be found unobjectionable."); *Succession of Cloud*, 530 So. 2d 1146, 1150 (La. 1988) (When an attorney enters into a contract with his client in "direct and flagrant violation of a

disciplinary rule and [] subsequent civil action raises the issue of enforcement (or annulment) of the contract, this court . . . should prohibit the enforcement of the contract which directly contravenes the Code adopted by this court to regulate the practice of law.")).

The contracts at issue here simply do not fall into the same category of contracts that Louisiana courts have found to be absolutely null. If the parties' decision to extend the May 31 Amended Purchase Agreement following the sale of the Hotel is illegal, Defendants have not pointed to a law or case that supports its argument that the arrangement was illegal.[6] Even if the parties executed the Amendments to make Operator "look like a partnership," Defendants have not pointed to any law or jurisprudence showing that this alleged decision would form an illegal object of a contract such that it should be rendered absolutely null. La. Civ. Code art. 2030; (*See* Doc. 134, p. 11).

Martin signed not one, not two, not three, but *five* Amendments to the May 31 Amended Purchase Agreement on behalf of Manager after the 2012 sale of the Hotel. (Doc. 121-5). Martin testified in her 30(b)(6) deposition on behalf of Manager that she read the Amendments to the May 31 Amended Purchase Agreement before signing them, including Paragraph 2 regarding the Put Option Period. (Doc. 121-21, p. 9, 11, 15, 16). Martin also testified regarding a January 31, 2013 email from Levine to Martin, sent after the sale of the Hotel:

Q. Mr. Levine says to you, "[Martin]: I asked our attorneys to prepare

---

[6] The Court notes that Defendants have taken a curious position here, because if the parties indeed conspired to commit fraud on the IRS, both parties and their respective principals or managers may be implicated in serious misconduct in such an arrangement.

16

an extension of the purchase agreement, extending the date from September 30, 2012, to January 31, 2013. If you concur, please have the document executed by both appropriate parties return a copy via email to me. If there is a problem, please call me soonest," and he gives his phone number. You see that?

A. Yes, I do.

Q. Did you have any problem with this that required you to give Mr. Levine a call?

A. I didn't call Mr. Levine. No, I did not.

(*Id.* at p. 12).

Martin also testified that Operator was a "partnership prior to the sale, and then when the sale happened and by [Plaintiff's] own documents the operating agreement and the entity dissolved, and [Plaintiff's counsel] and [Plaintiff] are the ones directing the IRS lawsuit and we're just signing whatever they sent us. Not very smart probably." (*Id.* at p. 12–13).

As noted, Martin is the manager of Manager. (Doc. 132-1, ¶ 26; Doc. 144, ¶ 26). Martin willingly signed the Amendments to the May 31 Amended Purchase Agreement on behalf of Manager. (*See* Doc. 121-5). No party disputes whether Martin had the authority to sign binding contracts on behalf of Manager. The parties in this case are commercially sophisticated entities who conducted business together for several years. The Louisiana Supreme Court has "long recognized that the freedom to contract is an important public policy." *Shelter Mut. Ins. Co. v. Rimkus Consulting Grp., Inc. of La.*, 2013-1977 (La. 7/1/14), 148 So. 3d 871, 881. Simply put, Manger is bound by the contracts it willingly signed. The Court will not invalidate the Amendment at issue because Manager failed to conduct due diligence

prior to signing.[7] It is axiomatic that the contracts have the effect of law for the parties. *See* La. Civ. Code art. 1983.

### b) *Dissolution*

Defendants further argue that the Put Option assumed Operator would be engaged in ongoing business operations, but once Operator was dissolved, Plaintiff no longer had a membership interest to sell. (Doc. 128, p. 8). As noted, the Hotel was sold to a third party on September 5, 2012. (Doc. 163-1, ¶ 38; Doc. 132-1, ¶ 38). Operator owned the furniture, fixtures, and equipment, which it sold to the third-party purchaser of the Hotel. (Doc. 163-1, ¶¶ 40–41; Doc. 132-1, ¶¶ 40–41). The furniture, fixtures, and equipment were substantially all of Operator's assets. (*Id.*). Accordingly, Defendants argue that Operator itself dissolved on September 5, 2012 along with the sale of substantially all of its assets, and from that time, Hotel operations ceased.[8] (Doc. 128, p. 9).

---

[7] In Elkins' 30(b)(6) deposition as corporate representative of Manager, Elkins testified that he "only learned of those subsequent attempts at amending what we believe to be a terminated purchase agreement after all of these issues came to bear," suggesting that he believed his firm never saw the Amendments until after 2015. (Doc. 121-20, p. 44). Elkins testified that his client or opposing counsel could have given him a copy of the Amendments. (Doc. 121-20, p. 44). Elkins stated that "when [he] asked Ms. Martin the reason that she had signed these amendments, she informed [Elkins] that she was simply provided with the amendments and told they were being done to make Operator 'look like a partnership' for the IRS." (Doc. 120-5, p. 9). Martin could have sent Elkins the Amendments for review prior to signing but failed to do so. Martin, as manager of Manager, cannot now assert a lack of knowledge as a reason to invalidate the contracts she freely signed, and could have asked Elkins to review prior to signing.

[8] Plaintiff argues that the "undisputed facts establish that Operator has not been dissolved and is still in existence today." (Doc. 132, p. 6). Plaintiff asserts that on or about December 11, 2006, the Operating Agreement was amended to expressly prohibit Manager from dissolving, winding-up, or liquidating the Company ("Amended Operating Agreement"). (*Id.* at p. 4).

Plaintiff counters that Defendants' argument ignores that even after September 5, 2012, the Parties executed multiple amendments to the May 31 Amended Purchase Agreement extending their business relationship. (Doc. 138, p. 2).

Indeed, the parties executed five additional amendments to the May 31 Amended Purchase Agreement following the alleged dissolution date. (See Doc. 121-5, p. 9–28). If Defendants sought solely to be bound by amendments existing prior to September 2012, Defendants should not have entered into five additional amendments after the alleged dissolution date, thereby extending the terms of the May 31 Amended Purchase Agreement, including the Put Option.

### c) Unequal Bargaining Power

Finally, Defendants assert that Manager had an unequal bargaining position and continually relied on the fact that Plaintiff or its counsel drafted the documents at issue. (Doc. 144, ¶ 44; Doc. 141, p. 3). Elkins testified that Plaintiff presented the terms for the organizational documents, "but it really was sort of a these are our [Plaintiff's] documents, if you want the transaction, you'll do it on these terms." (Doc. 144, ¶ 19). In response, Plaintiff contends that Defendants willingly entered into the agreement and benefited in the amount of an $11,735,693.00 investment in Operator as a result. (Doc. 138, p. 4; Doc. 110-1, ¶ 29; Doc. 135, ¶ 29). Defendants do not argue that they did not consent to the agreement, but rather seek to avoid their obligations now that they appear to be dissatisfied with the outcome. *See* La. Civ. Code art. 1927. Here, the parties are bound by the clear and unambiguous terms of the contracts they voluntarily executed.

### d) Conclusion

Accordingly, Manager owes Plaintiff the Put. The Purchase Agreement defines the Put as "the amount of twenty percent (20%) of [Plaintiff's] Capital Contribution to the Company plus the amount of any unpaid Asset Management Fees, Special Tax Distributions, and Priority Return and interest thereon owed to [Plaintiff] through the date of payment of the Put, . . ." (Doc. 110-1, ¶ 36; Doc. 135; ¶ 36; Doc. 121-4, p. 2). Plaintiff's Capital Contribution was $11,735,693.00.[9] (Doc. 110-1, ¶ 29; Doc. 135, ¶ 29). Twenty percent of Plaintiff's Capital Contribution is $2,347,138.60. (*See* Doc. 1). Manager owes Plaintiff $2,347,138.60, plus interest thereon, in accordance with the May 31 Amended Purchase Agreement and the Seventh Amendment to same. Plaintiff's Motion for Summary Judgment as to the Put Option is granted. (Doc. 110). Defendants' Motion for Summary Judgment as to the Put Option is denied. (Doc. 163).

---

[9] "Capital Contribution" is defined in the Operating Agreement as the following:

> Capital Contribution" means the total amount of cash and the Gross Asset Value of any property contributed or agreed to be contributed to the Company by each Member pursuant to the terms of this Agreement (minus any Liabilities secured by such contributed property that the Company assumes or takes subject to). Any reference in this Agreement to the Capital Contribution of a then Member shall include a Capital Contribution previously made by any prior Member in respect to the Company Interest of such then Member.

(Doc. 121-6, p. 8).

**b. Priority Return—Manager's Liability**

Next, Plaintiff argues that it is entitled to judgment on its claim for the Priority Return from Manager, not only for the period before the Master Lease was terminated and substantially all the assets of Operator were sold, but in perpetuity for every year until the price of the Put is paid. (Doc. 163-1, ¶ 67; Doc. 132-1, ¶ 67).

Based on a plain reading of the contract, Manager owes Plaintiff a Priority Return as an annual Distribution. (*See* Doc. 163-1, ¶ 68; Doc. 132-1, ¶ 68). While Manager owes Priority Returns "payable from Cash Flow or Capital Proceeds," the contract also contains a provision regarding "Unpaid Priority Returns." (*See* Doc. 121-6, p. 45). If there were, in fact, Unpaid Priority Returns exceeding $366,293 for a particular year at issue, Manager is obligated to advance the amount as a Project Expense Loan, which is to be immediately distributed to Plaintiff. (*See id.*).

The record is unclear, however, as to which years Priority Returns were owed, which years Priority Returns were unpaid, and whether the amount exceeded $366,293 during any given year. Accordingly, a genuine issue of material fact precludes summary judgment as to Priority Return. The Court will leave the issue of Priority Return open for a determination at trial, including: (1) which years Priority Returns were or are owed; (2) which years Priority Returns were unpaid; (3) whether the amount owed exceeded $366,293 during relevant years; and (4) whether Louisiana Revised Statutes § 12:1327(A) bars Priority Returns owed to Plaintiff, to the extent such sums are Unpaid Priority Returns that are owed to Plaintiff. Accordingly, both Plaintiff and Defendants' Motions for Summary Judgment are

denied as to Priority Returns. (Doc. 110; Doc. 163).

### c. Special Tax Distribution—Manager's Liability

Plaintiff argues that it is entitled to judgment on its Special Tax Distribution. (Doc. 125, p. 20). Defendants respond that Plaintiff has no Applicable Tax Rate because it is a disregarded entity for IRS tax purposes. (Doc. 134, p. 19). Defendants contend that as a pass-through entity, Plaintiff did not file tax returns and has never paid any taxes. (*Id.*). Defendants also argue that Plaintiff had an overall loss in 2012, which would have resulted in a 0% Applicable Tax Rate if Plaintiff were required to file returns. (*Id.*). Thus, Plaintiff's Applicable Tax Rate was 0%, and mathematically, 0% of any amount of allocated gain is $0. (*Id.*).

According to the Operating Agreement, first, if Operator generates Profits, Cash Flow, or Capital Proceeds in a certain amount, it must be distributed to each Member before any other Distributions or payments are made from Cash Flow or Capital Proceeds with respect to such Fiscal Year. (Doc. 121-6, p. 45). Second, if insufficient Cash Flow or Capital Proceeds are reported in any Fiscal Year to pay any amount due to Plaintiff, Manager shall advance the amount of the deficiency to Operator as a Project Expense Loan. (*Id.*).

The amount owed is determined by "the product of (i) the Profits allocable to a Member[;] and (ii) the Applicable Tax Rate." (*Id.*). The "Applicable Tax Rate" means the combined effective federal, state, and local income tax rate applicable to a Member in the Fiscal Year in which the Profits are allocated to the Member. (*Id.*). Here, Plaintiff asserts that its Applicable Tax Rate is 38%. (Doc. 135, ¶ 107).

Defendants assert that Plaintiff's Applicable Tax Rate is 0%. (Doc. 128, p. 17). Plaintiff presents its Responses to Defendants' Second Set of Interrogatories as evidence of its Applicable Tax Rate. (Doc. 121-13, p. 5).

The Court finds that a genuine issue of material fact precludes summary judgment as to the Special Tax Distribution. While a plain reading of the contract indicates that the Special Tax Distribution is owed, either from Cash Flow or Capital Proceeds or from a Project Expense Loan from Manager, the Court cannot determine Plaintiff's Applicable Tax Rate in order to determine the amount owed based on the material provided in the record alone. As Defendants assert, if Plaintiff's Applicable Tax Rate is in fact 0%, no Special Tax Distribution would be owed. Accordingly, both Plaintiff and Defendants' Motions for Summary Judgment are denied as to the Special Tax Distribution. (Doc. 110; Doc. 163).

### d. Asset Management Fees—Manager's Liability

Plaintiff argues that under the Operating Agreement, Defendants owe Plaintiff its Asset Management Fees, which have not been paid since 2011. (Doc. 125, p. 22).

For 2006, 2008, 2009, 2010, and 2011, Operator paid Plaintiff an Asset Management Fee. (Doc. 163-1, ¶ 86; Doc. 132-1, ¶ 86). It is undisputed that substantially all of Operator's assets were sold in 2012. (Doc. 163-1, ¶¶ 38; 40–41; Doc. 132-1, ¶¶ 38; 40–41). From a commonsense standpoint, a fee for "asset management services" cannot be owed after there are no assets to manage. (Doc. 121-6, p. 7–8). Accordingly, the Court concludes that after 2012, Defendants do

not owe Plaintiff an Asset Management Fee.

Plaintiff relies on Section 13.12 regarding "Survival of Obligations," which provides that that all monetary obligations "shall survive the sale by [Plaintiff] of its Interest or the termination of the Company until satisfied . . ." (Doc. 125, p. 23; Doc. 121-6, p. 83). However, the obligation here is to pay Asset Management Fees. As noted, if there are no assets to manage, it logically follows that Defendants do not owe a fee for asset management services. Importantly, an obligation cannot "survive" if the obligation to pay Asset Management Fees does not first exist. (*See* Doc. 121-6, p. 83). The obligation to pay Asset Management Fees ceased when there were no longer assets to manage.

The Court finds, however, that because the sale of substantially all of Operator's assets occurred on or about September 2012, and because the Operating Agreement provides for a prorated Asset Management Fee for partial years, Defendants must pay Plaintiff a cumulative fee in the amount of $10,000, prorated for the partial year of 2012, in accordance with the parties' agreement. (*See id.* at p. 7–8 (providing for "a cumulative fee in the amount of $10,000 (prorated for partial years")).

Defendants' Motion for Summary Judgment is granted as to Asset Management Fees for the period after 2012. (Doc. 163). Thus, Plaintiff's Motion for Summary Judgment is denied as to Asset Management Fees, with the exception that Defendants owe Plaintiff a prorated Asset Management fee for 2012. (Doc. 110).

### e. **WMF's Liability Pursuant to Guaranty**

Plaintiff asserts in the alternative that in the event that Manager is unwilling or unable to pay the Put, Plaintiff is entitled to enforcement of the obligations owed by WMF under the Guaranty. (Doc. 125, p. 17). The WMF Guaranty provides that WMF "unconditionally and irrevocably guarantee[d] to [Plaintiff], to the extent not paid or performed by [Manager] or [Operator], as the case may be, the punctual payment when due, and at all times thereafter. . ." (Doc. 121-3, p. 1). WMF acknowledged that the Guaranty was in full force and effect in each of the seven amendments to the May 31 Amended Purchase Agreement. (Doc. 121-5).

The Guaranty is clear and was executed repeatedly and voluntarily by WMF in the same manner as Manager—a representative of WMF signed a "Guarantor Acknowledgment" on WMF's behalf in each of the seven amendments to the May 31 Amended Purchase Agreement. (Doc. 121-5, p. 4, 8, 12, 16, 20, 24, 28). For the reasons discussed *supra* regarding the alleged absolute nullity of the Third through Seventh Amendments to the May 31 Amended Purchase Agreement, the Court will not render the Guaranty absolutely null.[10] "Where a guaranty's terms are plain and unambiguous, [the] court will enforce the guaranty according to those terms." *NCNB Tex. Nat. Bank v. Johnson*, 11 F.3d 1260, 1266 (5th Cir. 1994); *see also United States v. Southern Cycle Accessories, Inc.*, 567 F.2d 296 (5th Cir. 1978) (difficult choice of law issue need not be addressed because no conflict between Louisiana and federal law concerning guaranties). Accordingly, WMF is bound by the

---

[10] *See supra* Section IV(a)(ii)(a), "Absolute Nullity."

Guaranty it signed. Plaintiff's Motion for Summary Judgment is granted as to the Guaranty. (Doc. 110). Defendants' Motion for Summary Judgment is denied as to the Guaranty. (Doc. 163).

**f. Attorney's Fees**

Plaintiff argues that WMF is bound to pay interest, attorney's fees, and costs. (Doc. 125, p. 23). Defendants respond that Plaintiff is not entitled to recover attorney's fees or costs under the Guaranty. (Doc. 134, p. 23). Noting both arguments, the Court will leave open the issue of attorney's fees to be determined at trial.

**V. CONCLUSION**

Accordingly,

**IT IS ORDERED** that Plaintiff Chevron TCI, Inc.'s **Motion for Summary Judgment (Doc. 110)** is **GRANTED IN PART**. Specifically, Defendants owe the Put to Plaintiff in the sum of $2,347,138.60, plus interest;  WMF is a Guarantor of the Put; and Defendants owe Plaintiff a prorated Asset Management Fee in an amount to be determined at trial for the year 2012. In all other respects, Plaintiff's Motion for Summary Judgment is **DENIED**.

26

**IT IS FURTHER ORDERED** that Defendants Capitol House Hotel Manager, LLC and The Wilber Marvin Foundation's **Motion for Summary Judgment (Doc. 163)** is **GRANTED IN PART**. Specifically, Plaintiff is not entitled to Asset Management Fees, apart from a prorated Asset Management Fee for the year 2012. In all other respects, Defendants' Motion for Summary Judgment is **DENIED**.

Baton Rouge, Louisiana, this 29th day of March, 2021

_____

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

27