UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


CHEVRON TCI, INC.                                              CIVIL ACTION

VERSUS

CAPITOL HOUSE HOTEL MANAGER,                    NO. 18-00776-BAJ-RLB
LLC, ET AL.

## RULING AND ORDER

This matter is before the Court following a bench trial. After the Court ruled

on several issues at the summary judgment stage of this litigation, the following

issues were tried:

(1) Which years Priority Returns were or are owed, which years Priority Returns

were unpaid, whether the amount owed exceeded $366,293 during the relevant

years, and whether Louisiana Revised Statutes § 12:1327(A) bars Priority

Returns owed to Plaintiff (Doc. 198, p. 21);

(2) Plaintiff's Applicable Tax Rate in the calculation of the Special Tax

Distribution (*Id.* at p. 23);

(3) The amount of the prorated Asset Management Fee for the year 2012 (*Id.* at

p. 26); and

(4) Whether attorney's fees, interest, and costs are owed (*Id.*).

After trial, the parties filed proposed findings of fact and conclusions of law.

(Doc. 280; Doc. 281).

For the reasons stated herein, the Court rules for Plaintiff in part and

Defendant in part.

## I. BACKGROUND

This case centers on a contractual dispute arising from a failed real estate venture. Defendants Capitol House Hotel Manager, LLC ("Manager"), and The Wilbur Marvin Foundation ("WMF")[1] (collectively, "Defendants") sought to restore an old, abandoned hotel in downtown Baton Rouge. (Doc. 110-1, ¶¶ 8–10; Doc. 135, ¶¶ 8–10).

To accomplish the rehabilitation and restoration of the Hotel, additional capital was needed over and above conventional bank financing and other funding sources. (Doc. 163-1, ¶ 2; Doc. 132-1, ¶ 2). The use of historic tax credits and associated capital contributions, generated as a result of obtaining such credits, was sought to bridge the gap between the total cost of the project and the sum that a traditional lender would be willing to advance pursuant to a loan secured by a mortgage. (Doc. 163-1, ¶ 2; Doc. 132-1, ¶ 2). On November 4, 2004, Plaintiff expressed interest in investing in the "rehabilitation of the historic Capitol House Hotel in Baton Rouge, Louisiana." (Doc. 121-29).

### a. Entities Involved

Gary J. Elkins, Esq. ("Elkins"), an attorney "specializing in tax credits available through programs of the federal government," was hired to assist in securing financing. (Doc. 163-1, ¶ 3; Doc. 132-1, ¶ 3). In doing so, Elkins formed the

---

[1] WMF is a 501(c)(3) non-profit entity that has participated in various commercial development projects throughout Baton Rouge. (Doc. 110-1, ¶¶ 3, 6; Doc. 135, ¶¶ 3, 6).

following LLCs: (1) Defendant Manager; (2) Capitol House Hotel Operating Company, LLC ("Operator"); and (3) Capitol House Hotel Development Company, LLC ("Owner").[2] (Doc. 163-1, ¶¶ 1, 7; Doc. 132-1, ¶¶ 1, 7). Owner owned the real estate and bricks and mortar of the Hotel. (Doc. 163-1, ¶ 8; Doc. 132-1, ¶ 8). Operator leased the Hotel from Owner pursuant to a Master Lease Agreement, and owned the furniture, fixtures, and equipment. (Doc. 163-1, ¶¶ 8, 40; Doc. 132-1, ¶¶ 8, 40). Plaintiff and Manager, Defendant herein, became co-owners of Operator. (Doc. 110-1, ¶ 20; Doc. 135, ¶ 20).

### b. Contracts in Place

Operator filed its Articles of Organization and Initial Report with the Louisiana Secretary of State on December 13, 2005. (Doc. 110-1, ¶ 23; Doc. 135, ¶ 23). After more than one year of negotiations, the parties executed the relevant documents for the "Capitol House transaction" on December 29, 2005. (Doc. 132-1, ¶ 8; Doc. 144, ¶ 8).

On December 29, 2005, Plaintiff and Manager executed the Operating Agreement for Operator, pursuant to which Plaintiff, as the "Investor Member," became the owner of 99.9% of the membership interests in Operator, and Manager, as the "Managing Member," became the owner of .1% of the membership interests in Operator. (Doc. 163-1, ¶ 11; Doc. 132-1, ¶ 11).

Also on December 29, 2005, Plaintiff and Manager executed a "Purchase

---

[2] Manager is a subsidiary of Capitol House Hotel, L.L.C. (Doc. 110-1, ¶ 2; Doc. 135, ¶ 2; Doc. 94-1). Capitol House Hotel, L.L.C. is a subsidiary of WMF. (Doc. 110-1, ¶ 2; Doc. 135, ¶ 2; Doc. 94-1).

Agreement," containing "put" rights in favor of Plaintiff, and "call" rights in favor of Manager.[3] (Doc. 163-1, ¶ 10; Doc. 132-1, ¶ 10). On May 31, 2007 Plaintiff and Manager executed an Amended and Restated Purchase Agreement (the "May 31 Amended Purchase Agreement"). The May 31 Amended Purchase Agreement was subsequently amended multiple times, as discussed below.

Also relevant here, Plaintiff and WMF executed a Guaranty Agreement on December 29, 2005, whereby WMF, as guarantor, guaranteed various obligations set forth in the Purchase Agreement. (Doc. 163-1, ¶ 12; Doc. 132-1, ¶ 12; Doc. 121-3).

**c.  Sale of Hotel**

During July and August 2012, Manager was "working on" selling the Hotel. (Doc. 163-1, ¶ 23; Doc. 132-1, ¶ 23). On September 5, 2012, the Hotel was sold to a third party. (Doc. 163-1, ¶ 38; Doc. 132-1, ¶ 38). To accomplish the sale, the Master Lease between Owner and Operator had to be terminated. (Doc. 163-1, ¶ 39; Doc. 132-1, ¶ 39). Plaintiff consented to the sale and to the termination of the Master Lease. (Doc. 163-1, ¶ 39; Doc. 132-1, ¶ 39). Substantially all of Operator's assets were thereafter sold to the third-party purchaser of the Hotel. (Doc. 163-1, ¶¶ 40–41; Doc. 132-1, ¶¶ 40–41).

---

[3] Generally, a "put option" is an "option to sell something (esp. securities) at a fixed price even if the market declines; the right to require another to buy." *Option, Black's Law Dictionary* (11th ed. 2019). Generally, a "call option" is an "option to buy something (esp. securities) at a fixed price even if the market rises; the right to require another to sell. — Often shortened to call." *Option, Black's Law Dictionary* (11th ed. 2019).

### d. IRS Involvement

The parties structured the historic tax credit financing through a two-tiered transaction, wherein the tax credits available to Owner were passed from it to Operator and then allocated to Plaintiff pursuant to a HTC Pass-Through Agreement. (Doc. 163-1, ¶ 13; Doc. 132-1, ¶ 13).

In 2012, the United States Court of Appeals for the Third Circuit issued a decision casting doubt on whether such structures qualified for historic tax credits. *See Historic Boardwalk Hall, LLC v. Comm'r*, 694 F.3d 425 (3d Cir. 2012), *cert. denied*, 133 S.Ct. 2734 (2013). In the same year, the IRS sent a Notice of Proposed Adjustment ("NOPA") to Manager's power of attorney, KPMG, regarding Operator's federal taxes for the years 2006 through 2011, challenging Operator's partnership structure for tax purposes. (Doc. 110-1, ¶¶ 62–63; Doc. 135, ¶¶ 62–63; Doc. 121-25).

Elkins appeared at Manager's Federal Rule of Civil Procedure 30(b)(6) deposition and testified, on behalf of Manager, that the transaction at issue in this case was a pre-*Boardwalk* structure, and the "[IRS] was "attacking pre-[*Boardwalk*] transactions exactly like this" because the IRS "took the position that under this structure [. . .], a tax credit investor that had everything guaranteed and everything backstopped from the developer was not a partner in the partnership, did not have up side potential or down side risk, that everything was capped and protected and packaged." (Doc. 120-4, p. 8). Separately, in an Affidavit, Elkins stated: "The issue presented by the NOPAs was whether [Plaintiff] was a true partner with risk of loss

as presented by the structure of the deal that closed on December 29, 2005 . . ." (Doc. 120-5, p. 5–6).

During July and August 2012, around the time that Manager was "working on selling the Hotel," Plaintiff's counsel, Holland & Knight, and KPMG were working on a response to the June 4, 2012 NOPA. (Doc. 163-1, ¶¶ 23; 31; Doc. 132-1, ¶¶ 23; 31). Manager hired Elkins to assist KPMG in the response to the June 4, 2012 NOPA on behalf of Operator. (Doc. 163-1, ¶ 32; Doc. 132-1, ¶ 32). The parties ultimately sent their response to the IRS on December 1, 2012. (Doc. 163-1, ¶ 31; Doc. 132-1, ¶ 31).

Ultimately, the parties' involvement with the Hotel effectively came to an end when the Hotel was sold in 2012, along with the furniture, fixtures, and equipment. (Doc. 163-1, ¶ 38, 40–41; Doc. 132-1, ¶ 38, 40–41). However, after this time, the parties continued to regularly renew their May 31 Amended Purchase Agreement. (*See* Doc. 121-5). Indeed, Martin signed not one, not two, not three, but *five* Amendments to the May 31 Amended Purchase Agreement on behalf of Manager after the 2012 sale of the Hotel. (Doc. 121-5; *see also* Doc. 198, p. 16).

The Court has previously emphasized the following:

As noted, Martin is the manager of Manager. (Doc. 132-1, ¶ 26; Doc. 144, ¶ 26). Martin willingly signed the Amendments to the May 31 Amended Purchase Agreement on behalf of Manager. (See Doc. 121-5). No party disputes whether Martin had the authority to sign binding contracts on behalf of Manager. The parties in this case are commercially sophisticated entities who conducted business together for several years. The Louisiana Supreme Court has "long recognized that the freedom to contract is an important public policy." *Shelter Mut. Ins. Co. v. Rimkus Consulting Grp., Inc. of La.*, 2013-1977 (La. 7/1/14), 148 So. 3d 871, 881. Simply put, Manger is bound by the contracts it willingly signed. The Court will not invalidate the Amendment at issue because Manager failed to conduct due diligence prior to signing. It is

6

axiomatic that the contracts have the effect of law for the parties. *See* La. Civ. Code art. 1983.

(Doc. 198, p. 17). Accordingly, the Court found that Defendants are bound by the clear and unambiguous terms of the contracts they voluntarily executed. (*Id.* at p. 19).

### e.  Contractual Provisions at Issue in this Case

#### i.  *Put Option*

Paragraph 2(a) of the May 31 Amended Purchase Agreement contains a "put" option whereby Plaintiff could sell its interest in Operator to Manager, pursuant to the following terms:

2. Put Option

(a) The Purchaser hereby grants to the Investor Member an option (the "Put") to sell the Membership Interest of the Investor Member to the Purchaser upon the terms and conditions hereinafter set forth.

(Doc. 163-1, ¶ 15; Doc. 132-1, ¶ 15). Paragraph 2(b) of the same agreement placed a time limit on when the Put Option could be exercised by Plaintiff. It provides:

(b) The Put may be exercised by the Investor Member at any time during the six (6) months beginning on January 1, of the sixth calendar year beginning after the year in which the QRE Completion Date [4] occurs (or, if earlier, the date of dissolution of the Company) (the "Put Option Period").

(Doc. 163-1, ¶ 16; Doc. 132-1, ¶ 16).

Paragraph 2(d) of the May 31 Amended Purchase Agreement provides:

(d) Within thirty (30) days after delivery to [Manager] of an Election Notice from [Plaintiff], [Manager]shall pay to [Plaintiff] a purchase price (the "Put Price") in immediately available funds (with interest thereon at the Designated Prime Rate commencing on the 30th day following the

---

[4] The Operating Agreement defines "QRE Completion Date" as the date on which the last qualified rehabilitation expenditures with respect to the Building is placed in service for purposes of Section 47 of the Code. (Doc. 121-6, p. 24).

date of such delivery) in the amount of twenty percent (20%) of [Plaintiff's] Capital Contribution to the Company plus the amount of any unpaid Asset Management Fees, Special Tax Distributions, and Priority Return and interest thereon owed to [Plaintiff] through the date of payment of the Put Price, and amounts, if any, due to [Plaintiff] from [Manager], Landlord or Affiliates under the Operating Agreement or the Project Documents or any Guarantor under the Guaranty Agreement, including, without limitation, any amounts owed under Sections 5.3 and 5.4 of the Operating Agreement.

(Doc. 110-1, ¶ 37; Doc. 135; ¶ 7; Doc. 121-4, p. 2).

In the years to follow, the May 31 Amended Purchase Agreement was revised multiple times. Most relevant here, on February 24, 2015, the parties entered into a Seventh and final Amendment to the May 31 Amended Purchase Agreement, which stated: "The Put may be exercised by the Investor Member at any time prior to December 31, 2015 (the 'Put Option Period')." (Doc. 121-5, p. 25–28). On November 19, 2015, Plaintiff notified Manager that Plaintiff was exercising its Put Option under the Purchase Agreement as amended. (Doc. 163-1, ¶ 59; Doc. 132-1, ¶ 59).

At summary judgment, the Court held that Plaintiff is entitled to exercise the Put Option. (Doc. 198, p. 12). Specifically, the Court held:

Accordingly, Manager owes Plaintiff the Put. The Purchase Agreement defines the Put as "the amount of twenty percent (20%) of [Plaintiff's] Capital Contribution to the Company plus the amount of any unpaid Asset Management Fees, Special Tax Distributions, and Priority Return and interest thereon owed to [Plaintiff] through the date of payment of the Put, . . ." (Doc. 110-1, ¶ 36; Doc. 135; ¶ 36; Doc. 121-4, p. 2). Plaintiff's Capital Contribution was $11,735,693.00.9 (Doc. 110-1, ¶ 29; Doc. 135, ¶ 29). Twenty percent of Plaintiff's Capital Contribution is $2,347,138.60. (See Doc. 1). Manager owes Plaintiff $2,347,138.60, plus interest thereon, in accordance with the May 31 Amended Purchase Agreement and the Seventh Amendment to same.

8

(Doc. 198, p. 20).

### ii.   *Priority Return*

Plaintiff seeks the "Priority Return" from Manager as part of its claim for damages. (Doc. 163-1, ¶ 67; Doc. 132-1, ¶ 67). "Priority Return" is defined in the Operating Agreement as follows:

> "Priority Return" means a cumulative annual Distribution to the Investor Member (pro rated for periods of less than a full year) of an amount equal to (i) for the period beginning as of the Admission Date until the Completion Date, four percent (4%) and (ii) thereafter, three percent (3%), of its Adjusted Capital Contribution, payable from Cash Flow or Capital Proceeds in the manner set forth in Section 6.2, with interest at the rate of six percent (6%) per annum, compounded annually, from the date first due until the date paid; provided, however, the rate shall increase to twelve percent (12%) per annum, compounded annually, on the first anniversary of the Completion Date for all interest accruing on and after such date.

(Doc. 163-1, ¶ 68; Doc. 132-1, ¶ 68).

Cash Flow is defined in the Operating Agreement as follows:

> "Cash Flow" means the excess of Cash Receipts over Project Expenses. Cash Flow shall be determined separately for each Fiscal Year or portion thereof.

(Doc. 163-1, ¶ 69; Doc. 132-1, ¶ 69). Thus, "Cash Flow" means positive cash flow. (*Id.*).

"Capitol Proceeds" and "Capital Transaction" are defined in the Operating Agreement as follows:

> "Capital Proceeds" means the proceeds of a Capital Transaction.

> "Capital Transaction" means, with respect to the Lease or the Project:

> (i) a sale, assignment, or other disposition of all or substantially all of the Leasehold Interest;

> * * *

> (iv) the termination of the Lease prior to the expiration of its term;

9

....

(Doc. 163-1, ¶ 70; Doc. 132-1, ¶ 70).

Section 6.2(D) of the Operating Agreement provides the following regarding

"Unpaid Priority Returns":

> Unpaid Priority Returns; Notwithstanding anything to the contrary herein, if the unpaid Priority Return at the end of any Fiscal Year (including any interest owed with respect thereto) is greater than $366,293, then the excess amount of unpaid Priority Return (and accrued interest) over $366,293 (such excess being referred to herein as a "Priority Deficit) shall be advanced by [Manager] as a Project Expense Loan and immediately distributed to [Plaintiff].

(Doc. 121-6, p. 45).

> At summary judgment, the Court held:

> The Court will leave the issue of Priority Return open for a determination at trial, including: (1) which years Priority Returns were or are owed; (2) which years Priority Returns were unpaid; (3) whether the amount owed exceeded $366,293 during relevant years; and (4) whether Louisiana Revised Statutes § 12:1327(A) bars Priority Returns owed to Plaintiff, to the extent such sums are Unpaid Priority Returns that are owed to Plaintiff.

(Doc. 198, p. 21).

### iii.    Special Tax Distribution

Plaintiff also seeks reimbursement of what is called a "Special Tax

Distribution," which is defined in Section 6.2(C) of the Operating Agreement:

> Notwithstanding anything to the contrary contained in this Section 6, in any Fiscal Year in which the Company generates Profits, Cash Flow or Capital Proceeds in an amount equal to the product of (i) the Profits allocable to a Member and (ii) the Applicable Tax Rate . . . If there is insufficient Cash Flow or Capital Proceeds in any Fiscal Year to pay any amount due to the Investor Member pursuant to the provisions of this Section 6.2C, the Managing Member shall advance the amount of the deficiency to the Company as a Project Expense Loan. For purposes of this Section 6.2C, the term "Applicable Tax Rate" shall mean the

combined effective federal, state, and local income tax rate applicable to a Member in the Fiscal Year in which the Profits are allocated to the Member. Each of the Members shall notify the other Member, on or before December 31 of each Fiscal Year, of its Applicable Tax Rate for such Fiscal Year. If a Member fails to so notify the other Member, the Applicable Tax Rate for the previous Fiscal Year shall remain in effect. . . . If the Company has insufficient cash to make such a distribution, the Managing Member shall advance the amount of the deficiency to the Company as a Project Expense Loan.

(Doc. 163-1, ¶ 78; Doc. 132-1, ¶ 78). Plaintiff asserts that the amended 2012 tax return allocated $4,311,144 in income to Plaintiff. Plaintiff asserts that 38% of that amount ($1,638,235) at its Applicable Tax Rate, plus interest, is due to Plaintiff under the Operating Agreement. (*Id.*).

At summary judgment, the Court held:

The Court finds that a genuine issue of material fact precludes summary judgment as to the Special Tax Distribution. While a plain reading of the contract indicates that the Special Tax Distribution is owed, either from Cash Flow or Capital Proceeds or from a Project Expense Loan from Manager, the Court cannot determine Plaintiff's Applicable Tax Rate in order to determine the amount owed based on the material provided in the record alone. As Defendants assert, if Plaintiff's Applicable Tax Rate is in fact 0%, no Special Tax Distribution would be owed.

(Doc. 198, p. 23).

### iv.    *Asset Management Fee*

Plaintiff contended that it was owed an Asset Management Fee each year from 2012 until the present. (Doc. 163-1, ¶ 84; Doc. 132-1, ¶ 84). An "Asset Management Fee" is defined, in part, as a cumulative annual fee in the amount of $10,000, payable to Plaintiff as Investor Member, beginning on the Admission Date for Asset Management Services. (Doc. 163-1, ¶ 85; Doc. 132-1, ¶ 85). For years 2006, 2008, 2009, 2010, and 2011, an Asset Management Fee was paid by Operator to Plaintiff.

11

(Doc. 163-1, ¶ 86; Doc. 132-1, ¶ 86).

The Court ruled in Defendant's favor at summary judgment, finding:

> However, the obligation here is to pay Asset Management Fees. As noted, if there are no assets to manage, it logically follows that Defendants do not owe a fee for asset management services. Importantly, an obligation cannot "survive" if the obligation to pay Asset Management Fees does not first exist. (See Doc. 121-6, p. 83). The obligation to pay Asset Management Fees ceased when there were no longer assets to manage.
>
> The Court finds, however, that because the sale of substantially all of Operator's assets occurred on or about September 2012, and because the Operating Agreement provides for a prorated Asset Management Fee for partial years, Defendants must pay Plaintiff a cumulative fee in the amount of $10,000, prorated for the partial year of 2012, in accordance with the parties' agreement. (See id. at p. 7–8 (providing for "a cumulative fee in the amount of $10,000 (prorated for partial years")).

(Doc. 198, p. 24).

### v.  *Guaranty*

Plaintiff and WMF executed a Guaranty Agreement at the same time Plaintiff and Manager executed the Purchase Agreement and Operating Agreement. (Doc. 110-1, ¶ 26; Doc. 135, ¶ 26; Doc. 121-3). Additionally, in each of the seven Amendments to the May 31 Amended Purchase Agreement, WMF executed a Guarantor Acknowledgement, which states:

> The undersigned Guarantor acknowledges that the Guaranty is in full force and effect and the obligations of the Guarantor thereunder have not been modified except to the extent this [Amendment] amends the Purchase Agreement. Accordingly, the Guaranty will be construed as if the term "Purchase Agreement" as defined in the Guaranty refers to the Purchase Agreement as amended hereby.

(Doc. 110-1, ¶ 53; Doc. 135, ¶ 53; Doc. 121-5). The Guarantor Acknowledgements can be found on p. 4, Section C(4) of each amendment to the May 31 Amended Purchase

Agreement. (*Id.*). The Guaranty Agreement is provided in full in the record. (Doc. 121-3).

At summary judgment, the Court held that "WMF is bound by the Guaranty it signed." (Doc. 198, p. 25).

## II. PROCEDURAL HISTORY

On August 17, 2018, Plaintiff initiated this action against Defendants Manager and WMF. (Doc. 1).

On May 1, 2020, the parties filed their cross-Motions for Summary Judgment. (Doc. 110; Doc. 163). Thereafter, the Court issued a Ruling and Order on the parties' Motions for Summary Judgment. (Doc. 198). The Court held that Defendants owe the Put to Plaintiff in the sum of $2,347,138.60, plus interest; WMF is a Guarantor of the Put; and Defendants owe Plaintiff a prorated Asset Management Fee in an amount to be determined at trial for the year 2012. (*Id.* at p. 26).

Following a three-day bench trial beginning on November 16, 2021, the Court now rules in favor of Plaintiff in part and Defendant in part.

## III.  FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL

### A. Priority Returns

1. Plaintiff contends that Defendants owe Priority Return payments for the years 2009 through the present. (Doc. 280, p. 21, ¶ 123).

2. Under the definition of Priority Return in the Operating Agreement, a Priority Return is payable from positive Cash Flow or Capital Proceeds.[5]

---

[5] "Priority Return" means a cumulative annual Distribution to the Investor Member (pro

(Doc. 281, p. 24, ¶ 32; Exhibit J-12).

3. Cash Flow is defined in the Operating Agreement as "the excess of Cash Receipts over Project Expenses. Cash Flow shall be determined separately for each Fiscal year or portion thereof." (Doc. 281, p. 24, ¶ 33; Exhibit J-12).

4. A Capital Transaction includes: "(i) a sale, assignment, or other disposition of all or substantially all of the Leasehold Interest; ... [and] (iv) the termination of the Lease prior to the expiration of its terms; ... (vii) any other transaction generating cash proceeds to the Company that are not includable in determining Cash Flow." (Doc. 281, p. 24, ¶ 36; Exhibit J-12).

5. When there is no positive Cash Flow and insufficient Capital Proceeds, no Priority Return is due. (Doc. 281, p. 27, ¶ 51; Exhibit J-12).

6. If a Priority Return was not owed under the definition of "Priority Return," then no "Unpaid" Priority Return accrued, and thus, and no Project Expense Loan is triggered. (Doc. 281, p. 27, ¶ 49; Exhibit J-12).

7. From 2008 to 2012, Operator did not generate any positive Cash Flow

---

rated for periods of less than a full year) of an amount equal to (i) for the period beginning as of the Admission Date until the Completion Date, four percent (4%) and (ii) thereafter, three percent (3%), of its Adjusted Capital Contribution, **payable from Cash Flow or Capital Proceeds in the manner set forth in Section 6.2**, with interest at the rate of six percent (6%) per annum, compounded annually, from the date first due until the date paid; provided, however, the rate shall increase to twelve percent (12%) per annum, compounded annually, on the first anniversary of the Completion Date for all interest accruing on and after such date. (Exhibit J-12, p. 18 (emphasis added)).

from which Priority Returns would have been owed. (Doc. 281, p. 16, ¶ 98).

8.  From 2013 to present, after the sale of the Hotel, Operator never had any positive Cash Flow because there were no operations and no Cash Flow at all. (Doc. 281, p. 16, ¶ 100).

9.  Accordingly, no Priority Return payments are owed from Cash Flow.

10. From 2009 to 2010, Operator did not have sufficient Capital Proceeds for a Priority Return to be owed. (Doc. 281, p. 16, ¶ 101).

11. In 2011, Operator generated $6,730 in Capital Proceeds, but these funds were insufficient for any amounts to be paid to Plaintiff as the fifth ranking category in Section 6.2B. of the Operating Agreement. (Doc. 281, p. 16, ¶ 103; Exhibit J-12).

12. On September 5, 2012, there was a "Capital Transaction" of Operator, which resulted in $725,000 in Capital Proceeds. (Doc. 281, p. 26, ¶ 41; Exhibit J-12).

13. Proceeds from a Capital Transaction, such as the sale of the Hotel, must be distributed according to Section 6.2.B. of the Operating Agreement. (Doc. 281, p. 26, ¶ 42; Exhibit J-12).

14. Pursuant to Section 6.2.B. of the Operation Agreement, "Project Expense Loans" due to Manager primed any payment of Priority Return to Plaintiff and would have completely depleted any remaining capital for distribution. (Doc. 281, p. 26, ¶ 44; Exhibit J-12).

15. When the Hotel was sold on September 5, 2012, Operator owed $3,280,504 in Project Expense Loans plus $834,699 in accrued interest, for a total of $4,105,173. By December 31, 2012, the Project Expense Loans totaled $5,464,319. (Doc. 281, p. 16, ¶ 105).

16. The $725,000 in Capital Proceeds would have been entirely consumed by the Project Expense Loans owed and there would not have been sufficient funds for a Priority Return to be owed. (Doc. 281, p. 26, ¶ 45; Exhibit J-12).

17. Operator was insolvent after the termination of the Master Lease in 2012, resulting in the discontinuance of its operations, the sale of substantially all of its assets, and dissolution. (Doc. 281, p. 27, ¶ 52; Exhibit J-12).

18. No Priority Returns are owed to Plaintiff because there was never a year in which there was positive Cash Flow or sufficient Capital Proceeds to trigger the obligation to distribute Priority Returns. (Doc. 281, p. 27, ¶ 113).

**B. Special Tax Distribution**

1. Payment of the unpaid Special Tax Distribution is an obligation of Manager under the Purchase Agreement that is guaranteed by WMF. (Doc. 280, p. 36, ¶ 39).

2. Section 6.2(C) of the Operating Agreement indicates that Manager owes Plaintiff a Special Tax Distribution in the amount of the profits allocable

to a Member multiplied by the Applicable Tax Rate. (Exhibit J-12).

3. "Applicable Tax Rate" shall mean the combined effective federal, state, and local income tax rate applicable to a Member in the Fiscal Year in which the Profits are allocated to the Member. (Exhibit J-12).

4. At trial, Nadine Barroca, Plaintiff's former President, testified credibly that Plaintiff's Applicable Tax Rate in 2012 was 38%. (Doc. 277, p. 42, 82–83; Doc. 280, p. 24, ¶ 142).

5. The 38% Applicable Tax Rate reflects the federal statutory corporate tax rate of 35% combined with a 3% effective state rate. (Doc. 277, p. 82–83; Doc. 280, p. 24, ¶ 142).

6. Accordingly, a plain reading of Section 6.2(C) of the Operating Agreement indicates that Defendant Manager owes Plaintiff a Special Tax Distribution in the amount of the profits allocable to a Member multiplied by the Applicable Tax Rate of 38%. (Doc. 163-1, ¶ 78; Doc. 132-1, ¶ 78).

7. Profits were allocated to Operator for the purpose of calculating the Special Tax Distribution in Fiscal Year 2012. (Doc. 280, p. 23, ¶ 138; Doc. 277, p. 79).

8. Specifically, on the Schedule K-1 of the 2012 Amended Tax Return, Plaintiff was allocated $4,311,144 of income. (Doc. 280, p. 23, ¶ 140; Doc. 277, p. 81–82).

9. The profits allocable to a Member, $4,311,144, multiplied by the 38%

Applicable Tax Rate is $1,638,235.[6] (Doc. 280, p. 24, ¶ 145; Doc. 277, p. 86; Doc. 163-1, ¶ 78; Doc. 132-1, ¶ 78).

10. Accordingly, Manager owes Plaintiff a Special Tax Distribution of $1,638,235.

11. With interest, the total amount of Special Tax Distribution owed to Plaintiff as of the first day of trial, November 16, 2021, was $2,803,227. (Doc. 280, p. 24, ¶ 146; Doc. 277, p. 89, p. 205, p. 299).

12. The daily rate of interest on the Special Tax Distribution is $847 per day. (Doc. 280, p. 24, ¶ 148).

13. If there is insufficient Cash Flow or Capital Proceeds in any Fiscal Year to pay any amount due to Plaintiff pursuant to the provisions of Section 6.2C, Manager shall advance the amount of the deficiency to Operator as a Project Expense Loan. (Doc. 163-1, ¶ 78; Doc. 132-1, ¶ 78).

14. Manager has failed to pay the Special Tax Distribution, plus interest, owed to Plaintiff. (Doc. 280, P. 24–25, ¶¶ 151–52).

15. WMF guaranteed this obligation.[7] (Doc. 280, p. 25, ¶ 151).

---

[6] Section 6.2(C) of the Operating Agreement provides "Notwithstanding anything to the contrary contained in this Section 6, in any Fiscal Year in which the Company generates Profits, Cash Flow or Capital Proceeds in an amount equal to the product of (i) the Profits allocable to a Member and (ii) the Applicable Tax Rate . . ." (Doc. 163-1, ¶ 78; Doc. 132-1, ¶ 78).

[7] Section 1 of the Guaranty Agreement provides:

The Guarantor hereby unconditionally and irrevocably guarantees to [Plaintiff], to the extent not paid or performed by [Manager] or [Operator], as the case may be, the punctual payment when due, and at all times thereafter, of . . . (iii) each and every obligation of [Operator] and [Manager] to make any payment or advance any funds under the terms and conditions of . . . Section 6.2C of the Operating Agreement and under the Purchase Agreement.

### C. Asset Management Fees

1. During the bench trial, the parties agreed that Defendants did not owe Plaintiff Asset Management Fees. (Doc. 277, p. 11).

2. Rather, Plaintiff admitted that it owes Defendants a credit of $3,205. (Doc. 277, p. 11; Doc. 280, p. 36, ¶ 42).

3. Accordingly, the Court orders Plaintiff to pay Defendants $3,205 in Asset Management Fees, to the extent this amount remains unpaid. (*See* Doc. 280, p. 36, ¶ 42).

### D. Attorney's Fees, Interests, and Costs

1. Plaintiff is entitled to a judgment against Defendant WMF for payment of reasonable attorneys' fees and costs incurred by Plaintiff in an amount to be determined by the Court through a post-judgment Rule 54 motion for attorneys' fees. (*See* Doc. 280, p. 9, ¶ 45).

2. Defendant WMF agreed to pay attorneys' costs and fees in Sections 2 and 12 of the Guaranty Agreement. (Doc. 280, p. 25, ¶ 155; Joint Exhibit 14; *see also* testimony of Nadine Barroca, p. 91–95).

3. Plaintiff has demanded that WMF pay attorneys' fees and costs in connection with this litigation. WMF has failed to do so. (Doc. 280, p. 26, ¶ 160).

4. Section 2 of the Guaranty Agreement provides:

   If any of the obligations of [Manager] or [Operator] are not

---

(Joint Exhibit 14, p. 1).

complied with, in any respect whatsoever, as, when or before such obligations are due to be paid or performed, and without the necessity of any notice from [Plaintiff] to the Guarantor [WMF], the Guarantor [WMF] agrees to indemnify and hold harmless [Plaintiff] from any and all *Adverse Consequences* that [Plaintiff] may suffer by reason of any such non-compliance by [Manager] or [Operator] except with respect to any Adverse Consequences which are solely the result of the negligence or misconduct of [Plaintiff].

(Joint Exhibit 14, Section 2 (emphasis added)).

5.  The Operating Agreement defines "Adverse Consequences" "as all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, reasonable amounts paid in settlement, liabilities, obligations, taxes, liens, losses, expenses and fees, *including court costs and reasonable attorneys' fees and expenses*." (Joint Exhibit 12, p. 2 (emphasis added)).

6.  Section 12 of the Guaranty Agreement provides:

    *The Guarantor [WMF] shall pay on demand all reasonable attorneys' fees and other costs and expenses incurred by [Plaintiff] in the enforcement of or preservation of [Plaintiff's] rights under this Guaranty.* The Guarantor [WMF] agrees to pay interest on any expenses or other sums due to [Plaintiff] under this Guaranty that are not paid when due, at an annual rate equal to the Designated Prime Rate plus three percent (3%). The Guarantor's obligations and liabilities under this Paragraph shall survive any payment or discharge in full of the Guaranteed Obligations. It is not the intention of [Plaintiff] or the Guarantor [WMF] to obligate the Guarantor [WMF] to pay interest in excess of that lawfully permitted to be paid by the Guarantor [WMF] under applicable law. Should it be determined that any portion of the Guaranteed Obligations or any other amount payable

20

by the Guarantor [WMF] under this Guaranty constitutes interest in excess of the maximum amount of interest that the Guarantor [WMF], in the Guarantor's [WMF's] capacity as guarantor, may lawfully be required to pay under applicable law, the obligation of the Guarantor [WMF] to pay such interest shall automatically be limited to the payment thereof in the maximum amount so permitted under applicable law. The provisions of this Paragraph shall override and control all other provisions of this Guaranty and of any other agreement between the Guarantor [WMF] and [Plaintiff].

(Joint Exhibit 14, Section 12 (emphasis added)).

7. Finally, Section 3 of the Guaranty Agreement provides:

The Guarantor [WMF] shall be liable for the payment and performance of the Guaranteed Obligations, as set forth in this Guaranty, as a primary obligor. This Guaranty shall be effective as a waiver of, and the Guarantor [WMF] hereby expressly waives, any and all rights to which such Guarantor [WMF] may otherwise have been entitled under any suretyship laws in effect from time to time in the State.

(Joint Exhibit 14, Section 3).

## IV.   CONCLUSION

Accordingly,

**IT IS ORDERED** that Priority Return payments are not owed to Plaintiff.

**IT IS FURTHER ORDERED** that Defendant Capitol House Hotel Manager, LLC, shall pay Plaintiff Chevron TCI, Inc. the amount of $2,803,227 owed in Special Tax Distributions and interest as of the first day of trial. Defendant Capitol House Manager, LLC, shall also pay Plaintiff interest in the amount of $847 per day since this first day of trial until paid. To the extent Defendant Capitol House Hotel Manager, LLC fails to pay or perform, Defendant The Wilbur Marvin

Foundation shall pay Plaintiff the amount of $2,803,227 owed in Special Tax Distributions and interest as of the first day of trial, plus $847 in interest since the first day of trial, as it agreed to do in the Guaranty Agreement.

**IT IS FURTHER ORDERED** that Plaintiff Chevron TCI, Inc. shall pay Defendants Capitol House Hotel Manager, LLC, and The Wilbur Marvin Foundation $3,205 in asset management fees, to the extent this amount remains unpaid.

**IT IS FURTHER ORDERED** that Defendant The Wilbur Marvin Foundation shall pay Plaintiff Chevron TCI, Inc. reasonable attorneys' fees and costs incurred by Plaintiff in an amount to be determined by the Court through a post-judgment Rule 54 motion for attorneys' fees. Plaintiff shall file its Rule 54 motion within 21 days of the issuance of this Ruling and Order. Defendants shall file their Opposition, if any, within the time limits imposed by the Local Civil Rules.

Baton Rouge, Louisiana, this 31ˢᵗ day of March, 2022

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**